784 F.2d 1546
 40 Fair Empl.Prac.Cas. 678,
40 Empl. Prac. Dec. P 36,132, 54 USLW 2518,
4 Fed.R.Serv.3d 521
 Annette COX, et al., Plaintiffs-Appellants,
v.
AMERICAN CAST IRON PIPE COMPANY, a corporation, Defendant-Appellee.
Annette COX, et al., Plaintiffs-Appellants, Cross-Appellees,
v.
AMERICAN CAST IRON PIPE COMPANY, a corporation,
Defendant-Appellee, Cross-Appellant.
 Nos. 84-7382, 84-7462.
 United States Court of Appeals,
Eleventh Circuit.
 March 26, 1986.
 
 Robert L. Wiggins, Jr., Gordon, Silberman, Wiggins & Childs, Birmingham, Ala., for Annette Cox, et al.
 F.A. Flowers, III, Thomas, Taliaferro, Forman, Burr & Murray, Carol H. Wolfe, J. Patrick Logan, Birmingham, Ala., for American Cast Iron Pipe Co.
 Appeals from the United States District Court for the Northern District of Alabama.
 Before GODBOLD, Chief Judge, JOHNSON, Circuit Judge and TUTTLE, Senior Circuit Judge.
 JOHNSON, Circuit Judge:
 
 
 1
 This is a "pattern and practice" sex discrimination suit brought by a class of women employed at the American Cast Iron Pipe Company (ACIPCO) in Birmingham, Alabama, under Title VII of the Civil Rights Act of 1964, 42 U.S.C.A. Sec. 2000e et seq. During the decade in which these proceedings were heard by the district court under a succession of judges, the original class was decertified and judgment was ultimately entered in favor of only three of the individual claimants.
 
 
 2
 We conclude from our examination of these proceedings that the class decertification was improper and that numerous errors infect the district court's decisions in the individual cases. Accordingly, we REVERSE the decertification order and the judgments against the 18 losing plaintiffs, and we REMAND this case for retrial as a pattern and practice class action. Further, we VACATE the awards in favor of the three winning plaintiffs, and REMAND them for recalculation consistent with this opinion.
 
 
 3
 I. Jurisdiction in No. 84-7382.
 
 
 4
 Differing judgments for the two groups of plaintiffs involved in this Title VII sex discrimination suit have given rise to two separate appeals. The action styled No. 84-7382, which concerns the 18 plaintiffs who received unfavorable judgments in the lower court, raises a substantial jurisdictional question.[1] We turn first to that question, and then to the merits of each claim.
 
 
 5
 The facts relevant to our exercise of jurisdiction are as follows. On April 30, 1984, 585 F.Supp. 1143 (N.D.Ala.), the district court entered judgment in favor of three and against 18 of the 21 plaintiffs in the Title VII suit that gives rise to these actions. However, the court granted the 18 losing plaintiffs attorney's fees and costs as "prevailing parties," reasoning that their suit was a catalyst for change in the treatment of women at ACIPCO.
 
 
 6
 A number of Fed.R.Civ.P. 59 motions to alter or amend the judgment followed this order. Four of these motions were made on April 10, 1984, by the defendant, ACIPCO. Of these four, three concerned the judgment in favor of the winning parties, Morgan, Self and Williams. The fourth, which we consider here, was a request that attorney's fees and costs be assessed against the 18 losing plaintiffs. Plaintiffs also made several Rule 59 motions.
 
 
 7
 On May 21, 1984, the lower court denied all the plaintiffs' motions but left the four Rule 59 motions raised by the defendant pending, including the motion for attorney's fees and costs filed against the 18 losing plaintiffs. By the same order, the court, finding no just cause for delay, directed the entry of final judgment under Fed.R.Civ.P. 54(b) against the latter plaintiffs.
 
 
 8
 Rule 54(b) provides that "[w]hen more than one claim for relief is presented in an action ... the court may direct the entry of a final judgment as to one or more but fewer than all of the claims or parties only upon an express determination that there is no just reason for delay and upon an express direction for the entry of judgment." Fed.R.Civ.P. 54(b). This judgment must be appealed within 30 days. The 18 plaintiffs filed a notice of appeal within that period, on June 7, 1984.
 
 
 9
 However, when these parties filed their notice of appeal, defendant's Rule 59 motion for attorney's fees was still pending--it was not decided, in fact, until June 14, 1984. Fed.R.App.P. 4(a)(4) prohibits appeal when Rule 59 motions are pending. It provides in relevant part:
 
 
 10
 If a timely motion under the Federal Rules of Civil Procedure is filed in the district court by any party ... (iii) under Rule 59 to alter or amend the judgment; or (iv) under Rule 59 for a new trial, the time for appeal for all parties shall run from the entry of the order denying a new trial or granting or denying any other such motion. A notice of appeal filed before the disposition of any of the above motions shall have no effect. A new notice of appeal must be filed within the prescribed time measured from the entry of the order disposing of the motion as provided above. [Emphasis added.]
 
 
 11
 The 18 plaintiffs filed no new notice of appeal after the Rule 59 motions were decided. (The three prevailing plaintiffs, who had received no Rule 54[b] judgment, did so.)
 
 
 12
 Under the plain language of Rule 4(a)(4), the 18 plaintiffs' June 7, 1984, notice of appeal would appear to have no effect. The Supreme Court in Griggs v. Provident Consumer Discount Co., 459 U.S. 56, 61, 103 S.Ct. 400, 403, 74 L.Ed.2d 225 (1982), held that a notice of appeal filed while a Rule 59 motion was pending, is "not merely defective; it [is] a nullity"--or, as "Professor Moore ... aptly described the post-1979 effect of a Rule 59 motion on a previously filed notice of appeal: 'The appeal simply self-destructs.' " This Circuit has several times made similar observations. See Gibbs v. Maxwell House, Div. of General Foods Corp., 701 F.2d 145, 146 (11th Cir.1983); Scott v. Wainwright, 698 F.2d 427, 428 (11th Cir.1983); United States v. Valdosta-Lowndes County Hospital Authority, 668 F.2d 1177, 1178 (11th Cir.1982).
 
 
 13
 However, the Advisory Committee Notes to Rule 4(a)(4) indicate that "it would be undesirable to proceed with the appeal while the district court has before it a motion the granting of which would vacate or alter the judgment appealed from." Fed.R.App.P. 4(a)(4) Advisory Committee Note (emphasis added). This Court must decide whether or not a Rule 59 motion for attorney's fees is such a motion--or, put differently, whether a motion for attorney's fees under Title VII is properly styled a Rule 59 motion.
 
 
 14
 We hold that a motion for attorney's fees in a Title VII action is not a motion to alter or amend a judgment under Rule 59. Our ruling parallels that of this Court in Lucas v. Florida Power & Light Co., 729 F.2d 1300, 1301 (11th Cir.1984) (securities fraud class action), in which we said:
 
 
 15
 A motion respecting costs is not a motion to alter or amend a judgment under Rule 59. Rule 59 applies to motions for reconsideration of matters encompassed in a decision on the merits of the dispute, and not matters collateral to the merits. A motion for costs does not seek reconsideration of substantive issues resolved in the judgment, but relates exclusively to the collateral question of what is due because of the judgment.
 
 
 16
 Title VII on its face treats attorney's fees as costs. "[T]he court, in its discretion, may allow the prevailing party ... a reasonable attorney's fee as part of the costs." 42 U.S.C.A. Sec. 2000e-5(k). The former Fifth Circuit found a similar statutory provision persuasive in considering whether a motion for attorney's fees under the Civil Rights Attorney's Fees Awards Act of 1976, 42 U.S.C.A. Sec. 1988, was a motion to alter or amend a judgment under Rule 59(e). In Knighton v. Watkins, 616 F.2d 795, 797 (5th Cir.1980), that Court said:
 
 
 17
 In this case, attorneys fees are by statute part of the costs. Because they may be awarded only to prevailing parties, and in the discretion of the district court guided by the Johnson factors, attorney's fees will ordinarily be sought only after litigation. [Citation omitted.] Thus, a motion for attorney's fees is unlike a motion to alter or amend a judgment.
 
 
 18
 See also White v. New Hampshire Dept. of Empl. Sec., 455 U.S. 445, 102 S.Ct. 1162, 71 L.Ed.2d 325 (1982) (a postjudgment request for an award of attorney's fees under Sec. 1988 was not a "motion to alter or amend the judgment" subject to the timeliness standard of Rule 59[e]. This reasoning logically extends to a motion for attorney's fees under Title VII. Cf. Gordon v. Heimann, 715 F.2d 531, 536-37 (11th Cir.1983) (Rule 59 request for attorney's fees in RICO case was "collateral to the main action").
 
 
 19
 Our ruling is, furthermore, consistent with the district court's Local Rule 11 which provides that the question of attorney's fees "does not extend the time for appealing from ... the judgment [including a Rule 54(b) judgment] giving rise to the claim for attorney's fees...." N.D.Ala. Local Rule 11 (1982).
 
 
 20
 In sum, "[t]hough [defendant] styled its motion a Rule 59 ... motion, 'nomenclature is not controlling.' " Lucas, 729 F.2d at 1302, quoting Miller v. Transamerican Press, Inc., 709 F.2d 524, 527 (9th Cir.1983). Our exercise of jurisdiction is appropriate in action No. 84-7382.
 
 II. The Class Action
 
 21
 A. Facts and procedural history.
 
 
 22
 We turn now to the merits of the Title VII "pattern and practice" (i.e., class disparate treatment) sex discrimination suit before us. The named plaintiffs, Annette Cox, Brenda Morgan and Joyce Pandellis (nee Mitchell), filed this suit for both injunctive and individual monetary relief in the Northern District of Alabama on May 15, 1974, after the EEOC found probable cause to believe that the American Cast Iron Pipe Company (ACIPCO) discriminated on the basis of sex, and after an attempt at conciliation failed. The EEOC findings included, inter alia, the following:
 
 
 23
 Documentary evidence reveals that Respondent's salary non-exempt workforce has three job classifications with both male and female incumbents. Analysis of the record further reveals that female employees are paid lower wages than males in each of three job functions employing both males and females. The evidence of record further reveals that female employees had more experience and longevity than males, yet received lower wages.
 
 
 24
 The Commission concludes that there is reasonable cause to believe that this allegation is true.
 
 
 25
 * * *
 
 
 26
 * * *
 
 
 27
 Respondent's records reveal that the salary non-exempt work force is composed of 105 females and 73 males. The workforce is divided into 49 job classifications. Three of these classifications employ both male and female incumbents. These three classifications employ 6 (5%), of Respondent's female employees and 8 (11%), of Respondent's male employees. The remaining 99 females are assigned to 19 exclusively female positions and the remaining 65 males are assigned to 27 exclusively male positions.
 
 
 28
 The Commission concludes that there is reasonable cause to believe that Respondent Employer discriminates against females as a class by failing to promote them and by maintaining segregated job classifications on the basis of sex.
 
 
 29
 In the action before us it is undisputed that the defendant had a policy of overt workforce sex segregation. Before December 1973 ACIPCO deliberately reserved clerical jobs in its all-male production plant for men. The non-plant clerical jobs paid less than the plant clerical jobs. Only after this suit was filed did defendant allow a few women to make their way into the plant. Outside the plant, women were also kept on the lowest levels of the workforce and paid the least.
 
 
 30
 The defendant maintained this discriminatory system through word of mouth hiring. There was no posting or announcing of vacancies in salaried jobs. There were also no bid systems or formal applications for these jobs, and no written criteria for selection--the system was entirely one of subjective evaluation. Hourly job openings were sometimes posted, but only in the plant where women, of course, could not see them. In short, sex discrimination at ACIPCO was pervasive and overt.
 
 
 31
 Plaintiffs' complaint alleges incidents of discrimination in hiring, assignment, transfer, compensation, promotion, fringe benefits, maternity leave, sick leave, pregnancy benefits and sexual harassment. It also charges ACIPCO with maintaining sex-segregated job classifications and paying unequal compensation for equivalent work.
 
 
 32
 The procedural history of this suit is complex. Three district judges handled this case over the course of its more than ten-year history. The first judge heard evidence sufficient for him to certify a 23(b)(2) class in December 1981 including all past, present and future female employees of defendant affected by its advancement, training and compensation policies. This was a so-called hybrid 23(b)(2) class action since the plaintiffs sought both back pay and injunctive relief, as well as attorney's fees and costs. In his December 23, 1981, memorandum opinion, the lower court found that the named plaintiffs in this case, Cox and Morgan (Ms. Pandellis did not remain as a named plaintiff), had compensation and advancement, and compensation, advancement and training claims, respectively. The trial judge further found a "statistically significant correlation between sex, salary and position [at ACIPCO]. Defendant pays men more than women at every level and men hold more responsible higher paying jobs."
 
 
 33
 Two weeks after this class of some 240 plaintiffs was certified, the first judge resigned from the bench and a second judge assumed responsibility for the case. Defendant moved to decertify the class. In a June 7, 1982, order, the judge refused to grant defendant's decertification motion, but he did authorize defendants to issue a notice of a right to opt out of the 23(b)(2) class action. He wrote:
 
 
 34
 If, as defendant insists, the proposed class lacks numerosity or the members' claims are typical[2] of, or antagonistic to, the interests of the other employees, then the response to the notice should so indicate, and, if it deems appropriate, the court can then reconsider class certification.
 
 
 35
 Shortly thereafter, a third judge took over the case and approved the opt-out procedure. Two hundred thirty-two notices were mailed to class members. About half of the potential plaintiffs opted out after receiving the notice, leaving some 117 in the class.
 
 
 36
 In March 1983, the district court granted defendant's motion to serve interrogatories on the remaining members of the class. Only some 47 answered these interrogatories. The judge thereupon dismissed the claims of the other class members under Fed.R.Civ.P. 37, which permits dismissal as a sanction for failure to respond to discovery. Based on this class-member attrition, plaintiffs' answers to interrogatories, and his reading of the Supreme Court's General Telephone Co. of the Southwest v. Falcon, 457 U.S. 147, 102 S.Ct. 2364, 72 L.Ed.2d 740 (1982), decision, the trial judge then decertified the class on September 27, 1983. Twenty-three plaintiffs still sought review of their individual claims. The district court dismissed two cases and tried the remaining claims beginning on December 12, 1983. These trials ended on March 22, 1984.
 
 
 37
 On April 30, 1984, the district court entered judgment on behalf of three of the plaintiffs--Brenda Morgan, Rebecca Self and Karen Williams--and awarded them back pay of $19,200, $15,000 and $5,200, respectively. The judge declined to issue an injunction against the only other Title VII violation he found, "related to ACIPCO's previous, now withered, policy of reserving plant clerical jobs for men." As to the 18 other plaintiffs, he found in favor of ACIPCO.
 
 
 38
 The trial judge found that all the plaintiffs were prevailing parties "in the sense that their suits resulted in what might be called an 'attitude adjustment' at ACIPCO and in opening up plant jobs, an event which might not have taken place as soon or as dramatically if this suit had not been filed." On this ground the judge awarded all the plaintiffs attorney's fees and costs.
 
 B. Class decertification
 
 39
 We now examine the district court's use of opt-out and discovery procedures to decertify the class in this case. We conclude that the decertification itself and the procedures used to arrive at it constituted a clear abuse of discretion.
 
 
 40
 The district court entered a decertification order on its finding that the class did not satisfy the numerosity and commonality requirements of Fed.R.Civ.P. 23(a). Questions concerning class certification are left to the sound discretion of the district court. Freeman v. Motor Convoy, Inc., 700 F.2d 1339, 1347 (11th Cir.1983). Even after a certification order is entered, the judge remains free to modify it in the light of subsequent developments in the litigation. Falcon, 457 U.S. at 160, 102 S.Ct. at 2372 (1982).
 
 
 41
 The district court abused its discretion in decertifying the class on both numerosity and commonality grounds. We turn first to the issue of numerosity.
 
 
 42
 1. Numerosity.
 
 
 43
 The district court countenanced the use of opt-out and discovery sanction procedures to reduce the class from some 240 to 47 members. We note that the trial court's decertification of the 47-member class for lack of numerosity was by no means compelled by Rule 23 or the case law. As the trial judge who originally certified the class pointed out, citing 3B Moore's Federal Practice p 23.05 at n. 7 (1978), while there is no fixed numerosity rule, "generally less than twenty-one is inadequate, more than forty adequate, with numbers between varying according to other factors."
 
 
 44
 However, since we determine here that the trial court improperly allowed the numerosity of the class to be whittled down from 240 to 47, we need not decide this issue based on the smaller figure. Class numbers were reduced in two steps: (1) the court authorized and the defendant distributed a mistimed and coercive opt-out notice to class members and, (2) thereafter, the court authorized and the defendant executed discovery requests on the remaining 117 passive class members that amounted to improper opt-in procedures. We will examine each of these steps in turn.
 
 
 45
 a. The opt-out notice.
 
 
 46
 The opt-out notice written by the defendant and sent to each class member included the following:
 
 
 47
 p 3. Since a significant number of female salaried employees of the Company testified in open court in this case that they did not believe that they had been discriminated against on the basis of their sex by the Company, the Court has approved the distribution of this notice. Pursuant to this notice, you have the right to either participate in this case as a plaintiff class member or to 'opt out' and not participate.
 
 
 48
 p 5. ... If you take no action you remain a member of the class, you will continue to claim sex discrimination by the company, and you will be legally bound by any future orders of this Court with respect to this case. You may be called as a witness by either plaintiffs or the Company, and may be required to answer interrogatories ... or appear for your deposition.... Failure to comply with this Court's orders could result in your claim being dismissed, or could subject you to contempt proceedings.
 
 
 49
 Roughly one-half of the original class opted out after receiving this notice.
 
 
 50
 A district court, acting under its Rule 23(d)(2) discretionary power, may require that an opt-out right and notice thereof be given should it believe that such a right is desirable to protect the interests of the absent class members. Penson v. Terminal Transport Co., 634 F.2d 989, 994 (5th Cir. Unit B 1981). Such a decision may be reversed only for abuse of discretion. Holmes v. Continental Can Co., 706 F.2d 1144, 1155 (11th Cir.1983). Appellee urges that the opt-out notice authorized here was entirely appropriate to protect the rights of passive class members.
 
 
 51
 We disagree. Appellee's argument misconstrues the parameters of the court's discretion to permit an opt-out in a hybrid class proceeding. A hybrid Rule 23(b)(2) class action is one in which class members seek individual monetary relief, typically back pay, in addition to class-wide injunctive or declaratory relief. Penson, 634 F.2d at 994. The general rule in this Circuit is that absent members of (b)(2) classes have no automatic right to opt out of a lawsuit and to prosecute an entirely separate action. Holmes, 706 F.2d at 1153. But the hybrid form changes that rule slightly. "The Penson and Pettway [v. American Cast Iron Pipe Co., 494 F.2d 211 (5th Cir.1974) ] decisions represent an acknowledgement that the monetary relief stage of a Title VII case often 'begins to resemble a 23(b)(3) action' and that courts have shown increasing 'concern for providing for the due process rights of individual class members.' " Id. at 1154 (citation omitted) (emphasis added). Thus, under the hybrid theory, "absent class members [must] be given an opportunity to opt out of the class at the monetary relief stage of a Title VII lawsuit or settlement," Id. at 1155 (emphasis added).
 
 
 52
 Here, however, the trial court authorized an opt-out at the certification stage of the suit. This has not been the practice of our courts. See Holmes, id.; Penson, 634 F.2d 989; Fowler v. Birmingham News, 608 F.2d 1055 (5th Cir.1979); Bogard v. Cook, 586 F.2d 399 (5th Cir.1978) (opt-outs all permitted at monetary relief stage of suit). Indeed, the concerns that mandate opt-out procedures at stage two of a hybrid Title VII suit are not present at certification, where there is as yet no danger that individual class members may be bound against their interests by a money judgment or settlement. What is to be tried in stage one is simply the issue of liability--in this case, the question of whether the defendant actually had a policy of discriminating against women. By releasing some class members from the suit at this stage, a trial judge would invite the repeated litigation of the pattern and practice issue, with lamentable consequences for judicial economy and the finality and consistency of judgments.
 
 
 53
 To the extent that class members may wish to assert that no such pattern and practice of sex discrimination exists, of course, they may testify to that effect, or decline to present any claims at a stage two proceeding. But Rule 23 jurisprudence has never contemplated a right actually to opt out of a stage one suit for such a reason, or indeed for any reason other than for class members to pursue individual discrimination claims separately. Indications of non-interest in a suit are simply "inappropriate," as the district judge who certified the class originally observed, "at a class determination hearing." "[T]he fact that some class members might like the status quo will not defeat a claim on behalf of the class." Bucha v. Illinois High School Association, 351 F.Supp. 69, 72 (N.D.Ill.1972).
 
 
 54
 Thus, we clarify our approval of certain opt-out procedures in Penson and Holmes by holding today that an opt-out is nevertheless inappropriate before the monetary relief stage of a hybrid Rule 23(b)(2) class action brought under Title VII. Such a procedure would only tend to promote what was actually accomplished here--the improper use of a court-approved opt-out procedure designed to force class members to take a stand against their employers in order to stay in a controversial lawsuit. To authorize such a procedure was abuse of discretion.
 
 
 55
 Furthermore, we find that the content of this particular opt-out notice was clearly improper. Whether or not appellants failed to object to the notice before it was sent, as appellee alleges, we are satisfied that the trial court's authorization of such a notice itself constituted an abuse of discretion.
 
 
 56
 The notice was objectionable on three grounds. First, the reference in paragraph three, supra, to the assertions of some women that ACIPCO did not discriminate could be construed to refer to a pre-certification "poll" taken earlier by the defendant in which women were asked by supervisory personnel or senior employees whether they felt that they were discriminated against. The district judge who originally certified the class said that this poll was "strongly disapproved of," noting that "the pollsters demanded a signature and, when the employee refused to answer or answered yes, demanded an explanation. Notes of the fact of refusal or an explanation were made by the pollsters.... Several of the pollsters 'explained' that where employees held female-only jobs, there could be no discrimination." In this already coercive atmosphere, no reference in the opt-out notice to the opinions of anyone involved with the lawsuit, however those were solicited, was appropriate or indeed permissible.
 
 
 57
 Second, the suggestion in paragraph three that the court approved an opt-out notice because some women claimed that there was no discrimination appears to put the court's imprimatur on the sentiment, and on opting out because of it. Several courts have required a cautionary paragraph in opt-out notices to prevent the notice from being viewed as an official validation of a class claim. See C. Wright & A. Miller, Federal Practice and Procedure, Sec. 1787 (1982) at 162. That reasoning extends as well to an implicit official invalidation of a class claim. In appropriate circumstances a court may extend to class members an opportunity to opt out of a suit; it may not, however, appear to approve or recommend any particular decision on their part. An opt-out notice must be neutrally drafted.
 
 
 58
 Finally, paragraph five's threat of "contempt proceedings" against class members for failure to comply with court orders, and its warning that members may be called as witnesses or required to answer interrogatories, is particularly objectionable. In our experience, contempt proceedings are rarely if ever brought against passive class members. Further, sanctions are available in any case when a class member refuses to testify even if he or she opts out of the suit. Class members may also be required to answer interrogatories or to testify regardless of whether they remain in the suit. Thus, paragraph five amounts to no more than a string of empty threats, utterly inappropriate to a court-approved opt-out notice.
 
 
 59
 Taken together, these portions of the first opt-out notice are unduly coercive. To authorize the sending of such a notice was itself an abuse of discretion.
 
 
 60
 b. Discovery sanctions.
 
 
 61
 The improper reduction of numbers in this class had a second step, to which we now turn. After the opt-out notice diminished the class to 117 members, the lower court authorized the defendant to send the remaining class members seven pages of interrogatories. These individuals were cautioned that "[f]ailure to answer these interrogatories may result in the dismissal of any claim for damages you may have as a member of the plaintiff class...." Only 47 people completed, notarized and returned the interrogatories. The judge thereupon dismissed the claims of those who did not respond under Fed.R.Civ.P. 37(d), which authorizes sanctions for failure to comply with discovery orders.
 
 
 62
 We cannot countenance so cavalier an imposition of the harshest Rule 37 sanction. The decision to dismiss a claim, like the decision to enter a default judgment, ought to be a last resort--ordered only if noncompliance with discovery orders is due to willful or bad faith disregard for those orders. Coors v. Movement Against Racism, 777 F.2d 1538, 1542 (11th Cir.1985); Hashemi v. Campaigner Publications, 737 F.2d 1538 (11th Cir.1984). On appeal we will find abuse of discretion if lesser sanctions would suffice. Ford v. Fogarty Van Lines, Inc., 780 F.2d 1582, 1583 (11th Cir.1986). Here, the lower court made no finding of any bad faith resistance to discovery orders and, further, left no indication on the record that it considered and rejected sanctions less severe than dismissal. This was error.
 
 
 63
 Appellee cites Brennan v. Midwestern United Life Insurance Co., 450 F.2d 999, 1004 (7th Cir.1971) (securities class action), for the proposition that "absent class members may, under certain circumstances, be required to submit to discovery under Rules 33 and 34 and that the sanctions of Rule 37 are available to compel compliance with such discovery orders."
 
 
 64
 However, we do not find Brennan compelling. It has not met with wide acceptance in this Circuit. See Wainwright v. Kraftco Corp., 54 F.R.D. 532, 534 (N.D.Ga.1972). Indeed, Brennan has not been unswervingly followed in the Seventh Circuit, and it has arguably been narrowed by subsequent rulings. In Clark v. Universal Builders, 501 F.2d 324 (7th Cir.1974), a panel of the Seventh Circuit refused to uphold a lower court's dismissal of class members who failed to respond to interrogatories, finding that the defendants did not meet "the burden of demonstrating the meritorious nature of their request." Id. at 340. The Clark court sought assurance, inter alia, (1) that "the interrogatory [was] not designed 'as a tactic to take undue advantage of the class members or as a stratagem to reduce the number of claimants,' " id.; (2) that the interrogatory was "necessary," id. at 341; (3) that it did not seek "answers to questions that would have required the assistance of technical and legal advice in understanding the questions and formulating responsive answers thereto," id. at 340-41, n. 24; and (4) that it "did not seek information on matters already known to defendants," id.
 
 
 65
 We cannot conclude that the interrogatories served upon plaintiffs in this case would satisfy Brennan and Clark, were we to follow those rulings. We are indeed convinced that these interrogatories were improperly used as a strategy to reduce class size. Their "necessity" is further questionable since, as appellants point out, they were used in stage one proceedings in which the focus is the broad pattern and practice at issue, not the merits of individual claims. See International Brotherhood of Teamsters v. United States, 431 U.S. 324, 360-362, 97 S.Ct. 1843, 1867-1868, 52 L.Ed.2d 396 (1977). Individual discovery directed to passive class members would normally be appropriate only at stage two of a Title VII suit, and then only rarely.[3]
 
 
 66
 However, we decline to approve the use of the discovery sanction of dismissal against passive class members in a class action suit even to the extent that it may be permitted by Brennan and Clark. Used in a Rule 23(b)(2) setting, a discovery order threatening dismissal for non-compliance amounts to no more than an affirmative "opt-in" device--that is, it requires passive class members to take positive action to stay in the suit. The Advisory Committee specifically rejected the practice of forcing absent class members to opt into a Rule 23 class action to secure its benefits. As the reporter for the 1966 amendments to the Federal Rules of Civil Procedure put it:
 
 
 67
 [R]equiring the individuals affirmatively to request inclusion in the lawsuit would result in freezing out the claims of people--especially small claims held by small people--who for one reason or another, ignorance, timidity, unfamiliarity with business or legal matters, will simply not take the affirmative step.
 
 
 68
 Kaplan, Continuing Work of the Civil Committee: 1966 Amendments of the Federal Rules of Civil Procedure (I), 81 Harv.L.Rev. 356, 397-398 (1967), cited in Phillips Petroleum Co. v. Shutts, --- U.S. ----, ---- n. 4, 105 S.Ct. 2965, 2976 n. 4, 86 L.Ed.2d 628 (1985). See also In Re Gypsum Anti-Trust Cases, 565 F.2d 1123, 1126 n. 3 (9th Cir.1977); Robinson v. Union Carbide Corp., 544 F.2d 1258, 1262 (5th Cir.1977) (Wisdom, J., concurring).
 
 
 69
 We therefore conclude that the district court clearly erred in decertifying the plaintiff class in this case for insufficient numerosity.
 
 
 70
 2. Commonality.
 
 
 71
 The district court's second ground for decertification was its conviction that the claims of class members lacked commonality. Again, this is error.
 
 
 72
 The trial judge arrived at this conclusion from his private review of answers to defendant's interrogatories. He found what he described as claims of discrimination over different periods of time; varying allegations of discrimination in salary, promotion, medical coverage, training, job classification, and fringe benefits; and assertions both of no discrimination and of no opinion about discrimination. The judge concluded from this evidence that the class had no common claims, and that members cited only "individual acts of discrimination, not any policy of discrimination."
 
 
 73
 The trial judge's conclusion was erroneous. As we note above, the interrogatories should not have been authorized in the first place. Even had they been properly allowed, the responses of class members to those questions still represented not legal claims, but unformed and unselfconsciously presented impressions. To determine what legal claims plaintiffs allege, a judge must look not to defendant's interrogatories but to plaintiffs' complaint.
 
 
 74
 At best, the trial judge could only conclude from these answers that some specific claims might not be held by all class members. But Rule 23 does not require that all the questions of law and fact raised by the dispute be common. C. Wright & A. Miller, Federal Practice and Procedure, Sec. 1763 (1982) at 603. See also Johnson v. American Credit Co. of Georgia, 581 F.2d 526, 532 (5th Cir.1978). The claims actually litigated in the suit must simply be those fairly represented by the named plaintiffs. Nor is it clear from the interrogatories that plaintiffs allege no policy of discrimination; indeed, the "individual acts" they cite could very likely be manifestations of such a policy. Among plaintiffs, "[a]llegations of similar discriminatory employment practices, such as ... [the] use of entirely subjective personnel processes that operated to discriminate, would satisfy the commonality and typicality requirements of Rule 23(a)." Carpenter v. Stephen F. Austin State University, 706 F.2d 608, 617 (5th Cir.1983) citing Falcon, 457 U.S. at 159 n. 15, 102 S.Ct. at 2371 n. 15. Just such a subjective personnel policy is a major factor in the allegations here.
 
 
 75
 The trial judge erred further in determining that the Supreme Court's decision in Falcon, supra, invalidated the first judge's "across-the-board" certification on commonality grounds. It is true that the certifying judge relied in part on Hebert v. Monsanto Co., 576 F.2d 77 (5th Cir.1978), appeal dismissed on other grounds, 580 F.2d 178 (5th Cir.1981), a so-called "across-the-board" discrimination case, to certify the class. And it is true that Falcon, as this Court explained, "limits the application of 'across-the-board' suits based on allegations of pervasive discriminatory policies." Evans v. U.S. Pipe & Foundry Co., 696 F.2d 925, 928 n. 6 (11th Cir.1983). However, this is not the sort of across-the-board certification proscribed by Falcon.
 
 
 76
 Across-the-board suits are cases in which the "courts permit ... the named plaintiff acting as a 'private attorney general' to raise 'across-the-board charges of employment discrimination through-out an employer's force, and to represent persons who ha[ve] materially different employment situations from the named plaintiff." Schlei and Grossman, Employment Discrimination Law at 1217 (1983). This approach "presumes that a plaintiff who has suffered an alleged act of discrimination is qualified to represent all persons of the same basis (i.e., race, sex, etc.) in terms of any and all alleged discriminatory practices and issues." Id.
 
 
 77
 Falcon invalidated one such action, in which a Mexican American employee passed over for promotion in a firm sought to represent a class of "all hourly Mexican American employees who have been employed, are employed or may in the future be employed and all those Mexican Americans who have applied or would have applied for employment had the defendant not practiced racial discrimination in its employment practices." The plaintiff did not even make factual allegations about the firm's hiring practices in his complaint, and the court conducted no evidentiary hearing for certification.
 
 
 78
 After Falcon, the Supreme Court also vacated three appeals court decisions in which (1) the Fourth Circuit allowed discharged employees to represent a class claiming workplace discrimination, Brown v. Eckerd Drugs, Inc., 663 F.2d 1268 (4th Cir.1981); (2) the Ninth Circuit upheld certification of a class of future, past and present job applicants with arrest, marijuana or juvenile offense conviction records, Jordan v. County of Los Angeles, 459 U.S. 810, 103 S.Ct. 35, 74 L.Ed.2d 48 (9th Cir.1982); and (3) the Fifth Circuit allowed a university film editor and computer lab worker to represent a class of past, present and future female faculty or staff employees and applicants, University of Houston v. Wilkins, 654 F.2d 388 (5th Cir.1981). Since Falcon, this Circuit upheld a district court's refusal to allow a current employee in a seniority suit to represent rejected applicants. Motor Convoy, 700 F.2d at 1347.
 
 
 79
 These fact patterns are clearly distinct from that in the case at bar. Cox and Morgan do not seek to represent all women at ACIPCO "in terms of any and all alleged discriminatory practices and issues." Their pleadings are factual and specific, and their certified claims are limited to compensation, promotion and training policies. This is not by any means an exceptional combination. For example, in a post-Falcon decision, the Fifth Circuit approved the certification of a class of blacks and women injured by discrimination in assignment, pay, promotion and termination. Carpenter, 706 F.2d at 608.
 
 
 80
 In short, the class originally certified in this suit clearly satisfied the requirements of Rule 23. It was abuse of discretion to conclude otherwise. We therefore REVERSE the class decertification order.
 
 III. The Individual Claims
 
 81
 After the decertification, the district court tried 21 individual claims in a series of mini-trials, granting recovery in only three of the cases. These decisions are appealed to this Court.
 
 
 82
 After reviewing the district court's specific findings for each plaintiff, we REVERSE as to all of the 18 losing plaintiffs that appealed their decisions to this Court. We AFFIRM the district court's entry of judgment in favor of the other three plaintiffs, Morgan, Self and Williams, but we REMAND the awards in those cases for separate reconsideration.
 
 
 83
 A. The 18 losing plaintiffs.
 
 
 84
 The losing plaintiffs in this case were Belinda Black, Annette Cox, Joyce Crane, Glenda Duncan, Rhonda Edwards, Glenda Glenn, Bernice Huffman, Daphne Gay Johnson, Mary Dianne Lee, Judy Lockard, Jerri Ogletree, Joyce Pandellis, Mary Jane Seabury, Jewell Smith, Patricia Ann Terry, Velma Waldrop, Beverly Ann Walker and Julia Womble. Several errors taint the lower court's decisions against these plaintiffs as a group. Taken individually, some of these cases present additional grounds for reversal.
 
 
 85
 First, the district court erred as a matter of law in applying an incorrect burden of proof to the defendant in each of these individual cases. Texas Department of Community Affairs v. Burdine, 450 U.S. 248, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981), provides that in the typical Title VII disparate treatment case, once the plaintiff establishes a prima facie case of disparate treatment, the burden shifts to the defendant to rebut the inference of discrimination by articulating legitimate non-discriminatory reasons for its job decision. As we noted in Eastland v. Tennessee Valley Authority, 704 F.2d 613, 618-619 (11th Cir.1983), the defendant's burden is production, not persuasion. Although the trial judge here did not expressly say that he followed Burdine in the mini-trials, his repeated observation that plaintiffs "failed to prove" their claims of discrimination or that ACIPCO "successfully articulated" reasons for its job decisions indicates that he used the Burdine standard.
 
 
 86
 This standard was incorrect. In a pattern and practice case, if the plaintiff can establish "that [sex] discrimination was the company's standard operating procedure," see Teamsters, 431 U.S. at 336, 97 S.Ct. at 1855, the burden shifts to the employer to prove that the plaintiff was not, in fact, the victim of discrimination. Id. at 359, 97 S.Ct. at 1866. See also Franks v. Bowman Transportation Co., 424 U.S. 747, 772, 96 S.Ct. 1251, 1268, 47 L.Ed.2d 444 (1976). In other words, once a pattern and practice of discrimination is established, a rebuttable presumption that plaintiff was discriminated against because of her sex and is entitled to recovery obtains. The employer may overcome this presumption only with clear and convincing evidence that job decisions made when the discriminatory policy was in force were not made in pursuit of that policy. See Teamsters, 431 U.S. at 362, 97 S.Ct. at 1868.
 
 
 87
 We are conscious that Teamsters and Franks both involved large classes rather than individual plaintiffs. But the plaintiffs here are not, as in McDonnell Douglas, simply "individual complainant[s] seeking to prove one instance of unlawful discrimination." Id. at 358 n. 44, 97 S.Ct. at 1866 n. 44. Once the trial court found that ACIPCO in fact had a policy of reserving plant clerical jobs for men, these individuals were in substantially the same position as the Teamsters and Franks plaintiffs--that is, they had proven that sex discrimination "was the company's standard operating procedure," and they were entitled to the presumption that the complained-of employment practices violated Title VII.
 
 
 88
 Although the district court points to a gradual "withering" of this discriminatory policy triggered by the filing of EEOC claims in 1973, it made no finding as to when this pattern and practice was withered sufficiently to have no effect on plaintiffs.[4] Thus, we cannot determine from the district court's opinion exactly which individuals at which times should have had the benefit of a presumption of discrimination. Nor can we conclude in any case that the employer clearly met its burden of proving that its actions were undertaken for lawful reasons. For this reason alone, we must reverse the judgments against all the losing plaintiffs.
 
 
 89
 We note secondly that the district court erred as a matter of law in requiring plaintiffs to show that they had in fact applied for the jobs or promotions in question. Teamsters holds that nonapplicants may be entitled to relief where the employer's clear policy of exclusion would make an application a useless exercise. See id. at 367-68, 97 S.Ct. at 1870-71. Such a claim "requires two distinct determinations: that [the nonapplicant] would have applied but for discrimination and that he would have been discriminatorily rejected had he applied." Id. at 368 n. 52, 97 S.Ct. at 1871 n. 52.
 
 
 90
 Where no policy of exclusion is actually in place, but the employer continues to hire by word of mouth or other informal methods, a nonapplicant may still recover. In Carmichael v. Birmingham Saw Works, 738 F.2d 1126, 1133 (11th Cir.1984), we held that
 
 
 91
 when there is no formal notice of the job's availability, the plaintiff may have no means, within his own knowledge, of showing whether the employer considered him or not. Furthermore, when an employer uses such informal methods it has a duty to consider all those who might reasonably be interested as well as those who have learned of the job opening and expressed an interest. Accordingly, a plaintiff makes out a prima facie case--that is, he creates a presumption of discrimination and forces the employer to articulate legitimate reasons for his rejection--as long as he establishes that the company had some reason or duty to consider him for the post.
 
 
 92
 The record indicates that the defendant did use informal application procedures. Thus, under Carmichael, the employer should have considered each of the losing plaintiffs for any and all positions for which they could show that ACIPCO was on notice that they "might reasonably be interested." Again, since none of the plaintiffs had an opportunity to make such a showing, we are compelled to reverse the judgments against these claimants.
 
 
 93
 Apart from these across-the-board errors, we note a number of other misinterpretations of law that further taint the judgments against several individual plaintiffs. Two such errors are (1) the court's repeated observation that some of these women have no claim if the jobs they sought were filled by other women and (2) the court's insistence that many of these are non-cognizable "comparable worth" claims in any case. We have settled the former issue in this Circuit. The fact that a member of the protected class received the job in question does not necessarily mean that there is no Title VII violation. See Nix v. Radio/Rahall Communication, 738 F.2d 1181, 1185-86 (11th Cir.1984).
 
 
 94
 As to the question of comparable worth, we conclude that the lower court has confused the issue. These plaintiffs do not seek what the Supreme Court called, in explaining comparable worth, "increased compensation on the basis of a comparison of the intrinsic worth or difficulty of their jobs with that of other jobs in the same organization or community." County of Washington v. Gunther, 452 U.S. 161, 166, 101 S.Ct. 2242, 2246, 68 L.Ed.2d 751 (1981). Instead they argue that ACIPCO's policy of paying men's clerical jobs and women's clerical jobs on two entirely different compensation schemes is discriminatory. They maintain that the traditionally male jobs in the manufacturing division are compensated "objectively" based on a system of detailed job descriptions, standardized evaluations, and publicly-known job classifications, pay scales and review provisions, while compensation for non-manufacturing women's jobs is subjectively determined. At a minimum, this claim if proved entitles plaintiffs to injunctive relief against the disparate compensation schemes, and the trial court erred in failing to grant such an injunction. In cases presenting abundant evidence of consistent past discrimination, injunctive relief is mandatory absent clear and convincing proof that there is no reasonable probability of further noncompliance with the law. NAACP v. City of Evergreen, Ala., 693 F.2d 1367, 1370 (11th Cir.1982). The maintenance of the separate pay schemes alone conceivably might also entitle plaintiffs to back pay. This issue must be thoughtfully considered, rather than rejected out of hand.
 
 
 95
 Several further errors appear in the judgments against individual plaintiffs. First, the district court erred in its determination that the injury appellant Mary Jane Seabury suffered from a brief denial of a transfer to the plant was de minimis. We cannot accept this characterization. Title VII gives us no license to decide that any injury, however insignificant,[5] may be regarded as de minimis. As appellant argues, "[w]hat is small in principal is often large in principle." Jenkins v. United Gas Corp., 400 F.2d 28, 32-33 (5th Cir.1968).
 
 
 96
 Second, the district court improperly rejected the claim of appellant Bernice Huffman that she was "demoted" to an inferior job title and duties (although with the same salary) because she was female. The court was mistaken in assuming that this claim was not cognizable under Title VII. The former Fifth Circuit held in Swint v. Pullman Standard, 539 F.2d 77, 89 (5th Cir.1976), that "a Title VII plaintiff does not have to show economic loss to prove discrimination." Job titles and duties themselves are conditions of employment protected by Title VII.
 
 
 97
 Third, we question the district court's holding that the two black plaintiffs, Velma Waldrop and Patricia Ann Terry, could not recover for sex discrimination at ACIPCO because they were of necessity parties to a July 1980 consent decree in the Pettway race discrimination suit against the same defendant. The lower court seems to have made this determination sua sponte, although the defendant did not raise preclusion as an affirmative defense and the issue was apparently not briefed or argued before the court. This is a difficult question that deserves more than peremptory treatment. We are not satisfied from the lower court's conclusory findings of fact (no indication of whether or what Waldrop and Terry would recover under either claim, or calculation of any difference between the awards) and its sketchy conclusions of law (no thorough exploration of the preclusion problem) that this issue was properly considered and decided. In our view, "the district court stopped short of the fact finding and legal analysis required for resolution of this case." Corley v. Jackson Police Dept., 566 F.2d 994, 1001 (5th Cir.1978).
 
 
 98
 For the reasons set out above we must reverse the lower court's judgments against the losing plaintiffs. We note that we base our reversal on matters of law subject to plenary review by this Court. Cathbake Inv. Co., Inc. v. Fisk Elec. Co., Inc., 700 F.2d 654, 656 (11th Cir.1983). However, appellants also allege a number of factual errors in the decisions of the district court. We find it unnecessary to explore these here, given the extent of the legal error coloring these factual judgments. This Court has long adhered to the rule that
 
 
 99
 findings induced by or resulting from, a misapprehension of controlling substantive principles lose the insulation of F.R.Civ.P. 52(a) and a judgment based thereon cannot stand. [Citation omitted.]
 
 
 100
 Corley, 566 F.2d at 1001. Further, in some instances the lower court's findings of fact here on their own lack the sufficiency of detail and exactness required by Rule 52(a). See id. at 1003.
 
 
 101
 Our determination that the court below applied incorrect principles of law and made tainted or insufficient findings of fact determines our disposition of the appeals of the 18 losing plaintiffs. We hold, with the Corley Court, "that a remand solely for the purpose of making additional findings of fact and conclusions of law would not suffice to rectify the errors of the district court." Id. at 1005. We regret the necessity of drawing this proceeding out further, but in the interest of justice a new trial is clearly required for these plaintiffs. Since in Section II of this opinion we reversed the class decertification that led to much of this confusion and delay, we now REMAND these actions with instructions that the plaintiff class be recertified and that the trial proceed as a Title VII pattern and practice suit.
 
 
 102
 As to ACIPCO's cross-appeal challenging the award of attorney's fees and costs to the 18 losing plaintiffs as "prevailing parties," we VACATE these awards to await appropriate adjustment after remand.
 
 
 103
 B. The prevailing plaintiffs.
 
 
 104
 Appellants Brenda Morgan, Rebecca Self and Karen Williams were the plaintiffs that received judgments in their favor. We turn finally to their claims of error. Because we find these claims well-founded, we REMAND their awards to the district court for further action consistent with this opinion.
 
 
 105
 Appellants maintain first that they were entitled to injunctive relief against the defendant's practice of refusing to post notice of or to establish objective selection guidelines for jobs in its non-manufacturing divisions. We agree. See Evergreen, 693 F.2d at 1370-71. The fact that the court in Pettway enjoined, inter alia, discrimination on the basis of sex at ACIPCO is insufficient protection for these plaintiffs for two reasons. First, the latter injunction is not specific enough. These plaintiffs are entitled to an injunction closely tailored to remedy the discrimination complained of as in Evergreen (city ordered to publish notice of vacancies, job descriptions, and guidelines for selection) or Pettway (employer ordered to post vacancies and use objective selection criteria). Second, the Pettway injunction may not apply to some non-manufacturing divisions. The district court made no findings about the extent of its application. Plaintiffs are entitled to a comprehensive remedy.
 
 
 106
 Second, appellants maintain that their back-pay awards were improperly calculated. Back-pay awards are reviewed under the abuse of discretion standard. Robinson v. City of Fairfield, 750 F.2d 1507, 1512 (11th Cir.1985). However, the court's discretion must be "guided by sound legal principles." Albemarle Paper Co. v. Moody, 422 U.S. 405, 416, 95 S.Ct. 2362, 2371, 45 L.Ed.2d 280 (1975). Appellants maintain that as a matter of law their back pay should include more than "straight salary." Again, we agree. As our predecessor Court held in Pettway v. ACIPCO, 494 F.2d 211, 263 (5th Cir.1978) (Pettway III ):
 
 
 107
 Interest, overtime, shift differentials, and fringe benefits such as vacation and sick pay are among the items which should be included in back pay. Adjustment to the pension plan for members of the class who retired during this time should also be considered on remand.
 
 
 108
 The district court is instructed to consider these and other additions to straight salary (such as bonuses and interest, see id. ) in fashioning back-pay awards that will more nearly make these plaintiffs whole. The court should also consider and enter findings on whether any of these plaintiffs is entitled to non-monetary compensation such as retroactive departmental seniority or the award of jobs and promotions denied them on the basis of sex.
 
 
 109
 Finally, these three appellants contend that their "straight salary" was miscalculated because the district court resolved uncertainties about pay rates and dates of discrimination in favor of the employer. The former Fifth Circuit held in Pettway III, 494 F.2d at 260-61 and n. 149, that "uncertainties in determining what an employee would have earned but for the discrimination, should be resolved against the discriminating employer." We are bound by that rule.
 
 
 110
 Accordingly, we VACATE the awards in favor of Morgan, Self and Williams and REMAND them to the trial court for the recalculation of back pay and the entry of appropriate injunctive relief against ACIPCO.
 
 
 
 [1]
 There is no dispute concerning jurisdiction in No. 84-7462
 
 
 [2]
 This part of the order is ambiguous at best; the district judge perhaps intended "atypical."
 
 
 [3]
 Western Elec. Co. v. Stern, 544 F.2d 1196 (3d Cir.1976), relied on by the appellee, does not decide this question to the contrary. Although there the Third Circuit refused to uphold a lower court order that delayed class discovery until after the defendant had prevailed at stage one of the trial, id. at 1199, the court said (and the appellee does not repeat): "If our conclusion can be said to be inconsistent with United States v. U.S. Steel Corp., 520 F.2d 1043 (5th Cir.1975), we find that opinion unpersuasive." What the Second Circuit found unpersuasive is, of course, the law of this Circuit. U.S. Steel held that "the district court may require a class or subclass to come forward, as a part of the class or subclass prima facie case, with some threshold showing of economic loss and causation, if the defendant's evidence has drawn into substantial question the group's entitlement to move into Stage II claimant-by-claimant. In all likelihood the defendant's ability to raise substantial doubt about the group's entitlement will occur only rarely." Id. at 1054
 
 
 [4]
 We cannot accept, without more, the assumption that this policy ended abruptly when the first woman got a plant job at ACIPCO. The court must also inquire whether the discriminatory policy persisted de facto--that is, whether women continued to be discouraged from seeking these jobs either directly or through the defendant's continued use of subjective selection criteria and word-of-mouth hiring
 
 
 [5]
 Appellant Seabury figures her cost at $2,750 plus interest. The district court made no finding of the proper damages, but if that amount is correct it is hardly trivial in any case