Carolee Brady HARTMAN,
et al., Plaintiffs,

v.

Joseph DUFFY, Defendant.

Civ. No. 77–2019 (CRR).

United States District Court,
District of Columbia.

Nov. 23, 1994.

As Amended Jan. 9, 1995.

& Frederickson; Laurel P. Malson, Caryl L. Flannery of Crowell & Moring; Peter H. Doyle of Arter & Hadden; and Douglas B. Huron and Stephen Chertkof of Kator, Scott & Heller, Washington, DC, for plaintiffs.

Douglas A. Wickham, Robert L. Shapiro, and Daniel F. Van Horn, Asst. U.S. Attys., along with Eric H. Holder, Jr., U.S. Atty., and John Oliver Birch, Asst. U.S. Atty., Washington, DC, for defendant.

————

Bruce A. Frederickson, along with Susan L. Brackshaw, Jonathan C. Puth of Webster

## TABLE OF CONTENTS

INTRODUCTION ....................................................... 530
DISCUSSION ......................................................... 531
I. THE COURT FINDS THAT THE PETITIONERS ARE ENTITLED TO
 INTERVENTION OF RIGHT UNDER RULE 24(A) OF THE FEDERAL
 RULES OF CIVIL PROCEDURE ................................... 531
 A. TIMELINESS .............................................. 531
 B. INTEREST AND PRACTICAL IMPAIRMENT ..................... 533
 C. ADEQUACY OF REPRESENTATION ............................ 534
 D. EXHAUSTION OF ADMINISTRATIVE REMEDIES ............... 535
II. THE COURT FINDS THAT CERTIFICATION OF THE PLAINTIFF
 CLASS IS PROPER ............................................ 536
 A. THE RECORD DEMONSTRATES THAT THE CLASS WAS PROPER-
 LY CERTIFIED IN 1978 .................................... 538
 B. THE RECORD DEMONSTRATES THAT CERTIFICATION OF THE
 CLASS IS PROPER NOW .................................... 539
 (1) THE PLAINTIFFS' SHOWING OF SPECIFIC DISCRIMINATO-
 RY PRACTICES COMMON TO THE CLASS SATISFIES THE
 RULE'S COMMONALITY CRITERION ..................... 540
 (a) The record reveals that class members commonly experienced
 overt discrimination through the Agency's placement of explicit
 limitations on the employment of women, and through its
 employees' expression of stereotypical views of women ..... 540
 (b) The record reveals that class members were commonly subjected
 to gender-biased evaluations and discriminatory application of
 subjective criteria by the Agency ........................ 541
 (c) The Plaintiffs' claims that the Agency discouraged female appli-
 cants further support a finding of commonality ........... 543
 (d) The Plaintiffs' claims that the Agency used discriminatory re-
 cruitment devices and preselected men further support a find-
 ing of commonality ...................................... 543
 (2) THE COURT FINDS THAT THE CLAIMS OF THE REPRESEN-
 TATIVE PARTIES, INCLUDING THE INTERVENORS, ARE
 TYPICAL OF THE CLAIMS OF THE CLASS ............... 544
 (3) THE COURT FINDS THAT THE NAMED PLAINTIFFS ADE-
 QUATELY REPRESENT THE CLASS ..................... 546
CONCLUSION ........................................................ 547
APPENDIX A: ANECDOTAL TESTIMONY DESCRIBING OVERT DISCRIMI-
 NATION AND EXPRESS LIMITATIONS ON THE EMPLOYMENT OF WOM-
 EN IN CIVIL SERVICE AND FOREIGN SERVICE POSITIONS .......... 547
APPENDIX B: ANECDOTAL TESTIMONY DESCRIBING DISCRIMINATION
 IN THE FORM OF GENDER–BIASED EVALUATIONS AND DISCRIMINA-
 TORY APPLICATION OF SUBJECTIVE CRITERIA FROM THE RECORD IN
 1978, 1979 AND ON REMAND ................................... 550

## MEMORANDUM OPINION

CHARLES R. RICHEY, District Judge.

### INTRODUCTION

The above-captioned case is before the Court on remand from the Court of Appeals following its decision of April 5, 1994, in which it directed this Court "to reconsider the question of class certification, and to follow that determination with whatever is necessary to conclude the proceeding." *Hartman v. Duffey*, 19 F.3d 1459, 1475 (D.C.Cir.1994). Pursuant to Title VII of the Civil Rights Act of 1964, as amended by the Equal Employment Opportunity Act of 1972, 42 U.S.C. §§ 2000e–2000e–17, this case was initiated in 1978 on behalf of a large number of women who unsuccessfully applied for civil service or foreign service positions with the United States Information Agency ("USIA" or "Agency"). By order of April 19, 1978, the Court certified this case as a class action, with the class consisting of "all women who have applied for employment with or are currently employed by the United States Information Agency and who have been or continue to be adversely affected by the discriminatory employment practices of the defendant." On November 16, 1984, the Court found that the Defendant had "discriminated against women as a class with regard to hiring" in six occupational categories at the defendant agency. *Hartman v. Wick*, 600 F.Supp. 361, 375 (D.D.C.1984). That opinion also details the background of this lengthy litigation, as does *De Medina v. Reinhardt*, 686 F.2d 997, 1000–01 (D.C.Cir.1982), an appeal of an earlier decision in this case.

Thereafter, in January 1988, the Court ruled on the framework for the relief to be afforded the Plaintiff class. *Hartman v. Wick*, 678 F.Supp. 312 (D.D.C.1988). Under this scheme, class members who had applied for a civil service position at the USIA would be given individualized *Teamster*[1] hearings to assess appropriate relief, while class members who applied for foreign service jobs at the USIA would be permitted to compete for a designated number of such positions to be specifically set aside by the USIA for class relief purposes. With the consent of both parties, the Court then appointed a Special Master[2] to proceed with individualized *Teamster* hearings for each class member who applied for a civil service position, and to recommend to the Court a specific number of foreign service positions to be specially set aside by the Agency for class relief purposes.

In July 1992, the Court ordered the USIA to set aside thirty-nine foreign service positions over the next three years for women on the rank-ordered list of unsuccessful foreign service applicants. *Hartman v. Gelb*, No. 77–2019, 1991 WL 202367 (July 9, 1992). Appealing from that order, the Defendant challenged the designated number of remedial foreign service positions, the 1984 liability determination, and the 1978 class certification. Not reaching the liability finding or the issue of the number of reserved slots, the Court of Appeals found that, based on the record before it, the Court could not decide that the suit was properly certified as a class action. Thus, the case was remanded to this Court for reconsideration of the issue of class certification. *Hartman v. Duffey*, 19 F.3d 1459 (D.C.Cir.1994).

On remand, the Plaintiffs argue that class certification is proper because four types of discrimination existed in all six job categories at issue: (1) overt discrimination and express limitations on employment of women; (2) gender-biased evaluations and disparate application of subjective selection criteria; (3) discouragement of female applicants; and (4) preselection of male applicants and use of discriminatory recruiting devices. In support of this contention, the Plaintiffs supply detailed anecdotal evidence taken from the 1979 liability trial as well as from additional sworn testimony of proposed intervenors and other class members. In light of the Court of Appeals' decision, the Plaintiffs have also filed a Motion to Intervene which names twenty additional Plaintiffs as class representatives. The Plaintiffs argue that the proposed intervenors' inclusion as class repre-

---

1. *See International Brotherhood of Teamsters v. United States*, 431 U.S. 324, 372, 97 S.Ct. 1843, 1873, 52 L.Ed.2d 396 (1977).

2. The Court appointed a Special Master, Professor Stephen A. Saltzburg, pursuant to Rule 53 of the Federal Rules of Civil Procedure.

sentatives leaves no doubt that class certification covering all six job categories is proper.

With regard to the class certification issue, the Agency contends that the Plaintiffs have not and cannot show the existence of a common, pervasive policy of discrimination that impacts all members of the Plaintiff class. The Agency bases this conclusion on its own assertion that this Court is limited to the existing record, such that virtually all of the facts and circumstances alleged by the Plaintiffs in their briefs may not be considered. The Agency further argues that the named Plaintiffs' claims are not typical of the class and that named Plaintiff Hartman lacks sufficient standing to raise issues concerning either gender-based evaluations and discriminatory application of subjective criteria or concerning the discouragement of female applicants for positions at the USIA. The Defendant concludes that, absent the existence of a pattern and practice of discrimination, the Court has no choice but to decertify the Plaintiff class and allow for the filing of separate, discrete, individualized suits by all the Plaintiffs who have asserted claims in this case.

With regard to the intervention issue, the Defendant contends that the Petitioners' application is not timely and that granting intervention would lead to relitigation of the entire case. The Agency also argues that the intervenors' new challenges are time-barred for failure to exhaust administrative remedies.

The Court has carefully considered the parties' written submissions, their oral arguments, the applicable law, and the entire record in this case, with careful attention paid to the evidence before the Court at the time of the 1979 liability trial. For the reasons discussed herein, the Court finds that the Plaintiffs have satisfied the requirements set forth in Rule 24(a) of the Federal Rules of Civil Procedure for intervention as of right. In addition, the Court finds that class certification is proper, as members of the applicant class share a common injury, namely, the denial of employment as a result of Agency-wide overt discrimination against applicants on the basis of their gender. Ac-cordingly, the Court shall grant the Petitioners' Motion to Intervene, and deny the Defendant's Motion to Decertify the Applicant Class.

## DISCUSSION

**I. THE COURT FINDS THAT THE PETITIONERS ARE ENTITLED TO INTERVENTION OF RIGHT UNDER RULE 24(A) OF THE FEDERAL RULES OF CIVIL PROCEDURE**

The standard for intervention of right is set forth in Rule 24(a) of the Federal Rules of Civil Procedure:

> (a) Intervention of Right. Upon timely application anyone shall be permitted to intervene in an action:
>
> .　　.　　.　　.　　.
>
> (2) when the applicant claims an interest relating to the property or transaction which is the subject of the action and the applicant is so situated that the disposition of the action may as a practical matter impair or impede the applicant's ability to protect that interest, unless the applicant's interest is adequately represented by existing parties.

Fed.R.Civ.P. 24(a). Thus petitioners in a Title VII class action are entitled to intervention of right if they meet all the factors of Rule 24(a): (1) timeliness; (2) interest; (3) practical impairment; and (4) inadequacy of representation. *Cook v. Boorstin,* 763 F.2d 1462, 1466–71 (D.C.Cir.1985). In the instant case, the Court finds that the Petitioners have met all four factors and are therefore entitled to intervene in this matter.

### A. Timeliness

The first requirement for intervention of right is a timely application for intervention. Intervention is timely even after entry of judgment if the Petitioners moved to intervene "as soon as it became clear ... that the interests of the unnamed class members would no longer be protected by the named class representatives." *United Airlines, Inc. v. McDonald,* 432 U.S. 385, 394, 97 S.Ct. 2464, 2470, 53 L.Ed.2d 423 (1977). *See, e.g., Cook,* 763 F.2d at 1466 (petitioners' motion for intervention was timely when filed five

weeks after denial of class certification); *Hill v. Western Electric Co.,* 672 F.2d 381, 386 (4th Cir.), *cert. denied,* 459 U.S. 981, 103 S.Ct. 318, 74 L.Ed.2d 294 (1982) (petitioners' motion for intervention was timely when filed within ninety days of United States Supreme Court's denial of plaintiffs' writ of certiorari). The Petitioners in the instant matter claim that their Motion to Intervene is timely because it was filed twenty-five days after the date of the Court of Appeals' opinion remanding the issue of class certification.

■ The Court agrees that the Petitioners' motion is timely. The Petitioners promptly moved for intervention following the Court of Appeals' finding that the propriety of class certification was in question. Moreover, the Court of Appeals specifically suggested that this Court consider adding additional class representatives in its consideration of whether class certification is proper at the present time. *Hartman,* 19 F.3d at 1474. The Petitioners responded to that suggestion as soon as they learned that, in light of the Court of Appeals' concern with the propriety of the class as certified, their interests may not be adequately represented by the named Plaintiffs.

■ The Defendant asserts that the Petitioners' Motion to Intervene is sixteen years too late, and that the Plaintiffs should have recognized the possible need for intervention

after the conditional class certification in 1978, during the course of the 1979 liability trial, or subsequent to the 1982 appeal.[3] The Court finds these arguments without merit. The time elapsed from the inception of the litigation is only one factor to be considered in determining the propriety of intervention. *Hill,* 672 F.2d at 386. Moreover, a Court must assess timeliness in relation to the specific purpose intervention will serve. *United States v. American Telephone & Telegraph Co.,* 642 F.2d 1285, 1294 (D.C.Cir.1980). In the instant case, the Petitioners seek intervention in response to the Court of Appeals' recent concerns and directive regarding the class certification issue. Prior to this point, the Plaintiffs' position on class certification had not been seriously called into question. On April 19, 1978, the Court conditionally certified the class; in September of that year, the Court permitted three Petitioners to intervene as named Plaintiffs; and on remand, class certification was not seriously challenged.

The Defendant points out that, in its 1982 decision, the Court of Appeals recognized that the decision of the Supreme Court in *General Telephone Co. of the Southwest v. Falcon,* 457 U.S. 147, 102 S.Ct. 2364, 72 L.Ed.2d 740 (1982), may raise some questions regarding the breadth of the class, which then included both applicants and employees. *De Medina v. Reinhardt,* 686 F.2d

---

**3.** The Defendant further contends that intervention by new class representatives would require full discovery and a new liability trial, and that "to avoid such a horrendous result is precisely the reason for the timeliness requirement of Rule 24." Defendant's Amended Memorandum of Points and Authorities in Opposition to Plaintiffs' Request to Certify the Applicant Class, filed June 14, 1994, at p. 27. The Defendant makes this argument largely in response to the Petitioners' contention that the Court should reinstate the liability determination upon finding that intervention is proper. *See Hill v. Western Electric,* 672 F.2d 381 (4th Cir.), *cert. denied,* 459 U.S. 981, 103 S.Ct. 318, 74 L.Ed.2d 294 (1982); *Goodman v. Lukens Steel,* 777 F.2d 113 (3d Cir.), *aff'd,* 482 U.S. 656, 107 S.Ct. 2617, 96 L.Ed.2d 572 (1987). The Court reminds the Defendant that it has already held a full trial on the issue of liability, found for the Plaintiffs on remand from the Court of Appeals, and issued a detailed opinion setting forth the procedures for obtaining relief. These procedures include the institution of individual *Teamster* hearings for civil service

applicants before the Special Master. The Petitioners seek redress only to the extent already determined by the Court in its liability finding and each Petitioner is an active class member who has filed claims for relief under the Court's remedial order. The Defendant has ample opportunity to challenge the individual claims of each intervenor, as it has with respect to every other member of the Plaintiff class, at the hearings before the Special Master. With regard to the foreign service applicants, the Court has already ordered the Defendant to create a rank-ordered list, for each year at issue, of the women who unsuccessfully applied for foreign service positions at the USIA, and to set aside thirty-nine foreign service positions for class members. *See Hartman v. Wick,* 678 F.Supp. 312 (D.D.C.1988). Furthermore, the Petitioners have already sought re-evaluation of their candidacy for these positions. Motion to Intervene, filed April 29, 1994, at p. 12. Intervention of additional class representatives does not in any way alter the relief awarded foreign service applicants, so further discovery on individual claims is not warranted.

997, 1013 (D.C.Cir.1982). In a memorandum to this Court regarding the precise issue of class certification, however, the Defendant concluded that, because a proper class representative existed, the class members' claims may properly be considered on remand proceedings before the Court. Defendant's Memorandum to the Court, filed November 24, 1982, at p. 3. Thus, when given the express opportunity to brief the issue of class certification and put the Court on notice of questions regarding the propriety of the class representatives, the Defendant assured the Court that these issues did not warrant further attention and that the Agency was prepared to proceed with resolving what remained before the Court.

The Government contends, as the Court of Appeals found, that this memorandum did not constitute a waiver of any objection to the Court's determination of the propriety of any Rule 23(b)(2) certification. *Hartman v. Duffey*, 19 F.3d 1459, 1468 (D.C.Cir.1994). Even if this memorandum did not constitute a waiver notwithstanding all the years passed before the issue of class certification was raised before the Court of Appeals, however, in view of the fact that it has been labelled "ambiguous" by the Court of Appeals, *Hartman v. Duffey*, 19 F.3d at 1468, this Court finds that the memorandum should, at least, be construed against its authors such that any doubt or ambiguity regarding its purpose and effect is resolved in favor of the Plaintiffs. Accordingly, construing the ambiguous Government-authored memorandum in the Plaintiffs' favor, the Court finds that the Plaintiffs are not now barred from adding new class representatives, as they could and likely would have done back in 1982 but for the Government's ambiguity and seeming complacency with the very issue now before the Court, the propriety of class certification.

The Court thus concludes that only when the Court of Appeals recently remanded the issue of class certification and suggested the addition of class representatives was there any need for the Petitioners to come forward. Therefore, the Court finds that the Petitioners have satisfied the timeliness criterion of Rule 24(a).

## B. *Interest and Practical Impairment*

The second and third requirements for intervention of right are that the Petitioners claim "an interest relating to the property or transaction which is the subject of the action" and that the "disposition of the action may as a practical matter impair or impede the applicant's ability to protect that interest." Fed.R.Civ.P. 24(a)(2). The Court finds that the Petitioners have met the interest and practical impairment requirements of Rule 24(a)(2).

 The interest requirement " 'is primarily a practical guide to disposing of lawsuits by involving as many apparently concerned persons as is compatible with efficiency and due process.' " *Cook*, 763 F.2d at 1466 (quoting *Foster v. Gueory*, 655 F.2d 1319, 1324 (D.C.Cir.1981)). The Petitioners must have suffered injury from wrongful acts that were similar to those complained of by the original Plaintiffs, and their claim for relief must be founded on the same statutory rights as the Plaintiffs' claims, even if the individual acts of discrimination alleged differ. *Id.* (citing *Foster*, 655 F.2d at 1324–25). The Court finds the Petitioners' arguments that they have an interest in this matter convincing. The Petitioners have suffered injury from similar wrongful acts alleged by the Plaintiffs and their claims are based on the same statutory rights which protect against discrimination by potential employers.[4] Moreover, the Petitioners contend that

---

4. For example, the Petitioners claim that, while Plaintiff Carolee Brady Hartman alleged that she was denied a position as a Writer/Editor because, she was told, the Defendant was looking for a male to fill the job, Petitioner Patricia De Young alleged that she was denied numerous positions in foreign affairs because, she was told, the Defendant was seeking only males. Similarly, Petitioner Jahanara Hasan alleges that, when she was denied Foreign Language Broadcaster positions, she was told that the Defendant intended

to hire a male and that broadcasting was too strenuous a job for a woman. Petitioner Michal Shekel alleges that when she was denied a position, she was told she had a "girl's voice" and a "guy's name." Petitioner Carolyn Turner alleges that when she was denied positions, she was told that hiring her might hurt her marriage and that a female producer would pose additional costs. Finally, Petitioner Shirley Hill Witt alleges she was denied a Foreign Service Officer position

they have an interest because they are each class members in whose favor the Court has issued a liability determination and set forth a procedure for obtaining relief. The similarity between the factual and legal claims of the Petitioners and those of the Plaintiffs amply satisfies the interest requirement.

■ With regard to the practical impairment prong of Rule 24(a), the Petitioners assert that, because they are challenging the same discriminatory policy exhibited through the same or similar subjective hiring practices as those the Plaintiffs experienced, the potential *stare decisis* effects of a ruling denying intervention would, as a practical matter, impair their interests. *See Cook*, 763 F.2d at 1466–67 (potential *stare decisis* effects deemed sufficient to satisfy Rule 24(a)(2) practical impairment requirement).

Significantly, the Defendant has failed to submit any convincing challenge to the Petitioners' arguments with respect to either the interest or the practical impairment requirements of Rule 24(a). Indeed, in the Defendant's Opposition, the Agency concedes that "some of the intervenors' claims meet the second and third criteria for intervention since they have an interest in the suit and that interest may be impaired or impeded by resolution of these issues." Defendant's Opposition, at p. 27. The Defendant goes on to argue, however, that the Petitioners who applied for technical and foreign service positions *may* not have an interest in the case *should* the Court find that the class was improperly certified with respect to those positions. The Court finds that this conjecture is not relevant to the issue at hand,

namely, whether the Petitioners have a current interest in the suit and whether that interest may be impaired by disposition of the suit. In view of Petitioners' current interest in the outcome of this litigation, along with the variety of ways the decision on remand could potentially impair the Petitioners' interests, the Court finds that the interest and practical impairment prongs of Rule 24(a) are met here.

### C. Adequacy of Representation

■ The fourth requirement for intervention of right is that the Petitioners' interests be adequately represented by the existing parties. This requirement "is satisfied if the applicant shows that representation of his interest 'may be' inadequate; and the burden of making that showing should be treated as minimal." *Trbovich v. United Mine Workers of America*, 404 U.S. 528, 538 n. 10, 92 S.Ct. 630, 636 n. 10, 30 L.Ed.2d 686 (1972). In addition, the party opposing intervention bears the burden of demonstrating the inadequacy of representation. *United States v. American Telephone & Telegraph Co.*, 642 F.2d 1285, 1295 (D.C.Cir.1980).

■ In the instant case, the Court of Appeals suggested that class representation may not be adequate because, in particular, both civil service and foreign service jobs are encompassed by the class. *See Hartman*, 19 F.3d at 1472. The Petitioners argue that, given the Court of Appeals' language on the subject, the class *may* not be adequately represented and, notably, the Defendant agrees.[5] Defendant's Opposition, at p. 29.

---

because the agency had "enough women in the Foreign Service at mid-level." *See* Petitioners' Motion to Intervene, filed April 29, 1994, at pp. 10–11.

The Defendant takes great pains to challenge the merits of each Petitioner's claim and argue that they are not proper class representatives. However, "[a]n application to intervene should be viewed on the tendered pleadings—that is, whether those pleadings allege a legally sufficient claim or defense and not whether the applicant is likely to proceed on the merits." *Williams & Humbert Ltd. v. W & H Trade Marks (Jersey) Ltd.*, 840 F.2d 72, 75 (D.C.Cir.1988). Accordingly, the Court finds that the Defendant's arguments on the merits of the Petitioners' claims have no bearing on its determination of whether intervention of right is proper.

5. The Defendant argues that such a finding compels decertification of the Plaintiff class under the Rule 23(a) of the Federal Rules of Civil Procedure. Defendant's Opposition, at pp. 29–30. The Agency cites no authority, however, in support of its implicit assumption that a finding of inadequacy of class representation under Rule 24(a) dictates the outcome of this Court's inquiry as to adequacy of class representation under Rule 23(a). Pursuant to the Supreme Court's discussion in *Trbovich*, the Petitioners have merely asserted that the representation of their interests *may be* inadequate for Rule 24(a) purposes in light of the Court of Appeals' decision remanding this case for consideration of the class certification issue. *See Trbovich*, 404 U.S. at 538 n. 10, 92 S.Ct. at 636 n. 10 (1972). The question of the propriety of class certification is a

Consequently, the Court finds that inadequacy of representation exists for purposes of Rule 24(a).

### D. *Exhaustion of Administrative Remedies*

In a further attempt to defeat intervention, the Agency argues that the intervenors' new challenges are time-barred since they failed to exhaust their administrative remedies. Defendant's Opposition, at p. 18. Moreover, the Agency contends that only Ms. Hartman has filed an administrative class complaint, and her complaint failed to identify any specific employment practice she sought to challenge. *Id.* at p. 20. The Court finds, however, that the intervenors' claims are not time-barred.

 It is undisputed that exhaustion of administrative remedies is a prerequisite to filing an employment discrimination suit under Title VII. *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 798, 93 S.Ct. 1817, 1822, 36 L.Ed.2d 668 (1973); *Jarrell v. United States Postal Service,* 753 F.2d 1088, 1091 (D.C.Cir.1985). In addition, it is well settled that once an individual complainant has filed charges with the Equal Employment Opportunity Commission ("EEOC"), absent class members need not also exhaust administrative procedures in order to participate in a class action suit. *Abermarle Paper Co. v. Moody,* 422 U.S. 405, 414 n. 8, 95 S.Ct. 2362, 2370 n. 8, 45 L.Ed.2d 280 (1975); *League of United Latin American Citizens v. Hampton,* 501 F.2d 843, 847 (D.C.Cir.1974). The Court of Appeals for this Circuit has recited the rationale behind this rule: " 'It would be wasteful, if not vain, for numerous employees, all with the same grievance, to have to process many identical complaints with EEOC.' " *Foster v. Gueory,* 655 F.2d 1319, 1322 (D.C.Cir.1981) (quoting *Oatis v. Crown Zellerbach Corp.,* 398 F.2d 496, 498 (5th Cir. 1968)). In addition, the *Foster* Court identified "the critical factor in determining whether an individual Title VII plaintiff must file an EEOC charge, or whether he may escape this requirement by joining with another plaintiff who has filed such a charge, is the similarity of the two plaintiffs' complaints."

separate inquiry, and the Court shall treat it as

*Id.* A district court must be alert to "a real possibility that one of the claims might be administratively settled while the other can be resolved only by the courts." *Id.*

The Agency cites *Foster* as support for its contention that the intervenors must file separate complaints with the EEOC and cannot assert their claims in federal court via Ms. Hartman's proper exhaustion of administrative procedure. Defendant's Opposition, at p. 21. However, the *Foster* Court held that the intervenors in that case had asserted claims of discrimination so similar to those asserted by the original plaintiffs that no purpose would be served by requiring them to file separate charges with the EEOC. *Foster,* 655 F.2d at 1323. In *Foster,* the plaintiffs filed suit alleging racial discrimination under Title VII by labor organizations and employers in matters relating to employment as pile drivers. The plaintiffs were four members of the defendant labor union, one of which received a right-to-sue letter from the EEOC. The District Court denied class certification, and three individuals who were *not* members of the defendant union moved to intervene, alleging they had suffered the same kinds of discrimination. *Id.* at pp. 1320–21. The district court denied their motion, but the Court of Appeals found that, because the intervenors alleged facts indicating that they were similarly situated and received the same discriminatory treatment, intervention was proper. The Court of Appeals reasoned:

> This discriminatory treatment constitutes the basis for both appellants' and the original plaintiffs' Title VII claim for relief. This being so, the EEOC charge filed by one of the original plaintiffs served the principal functions of the EEOC filing requirement, enabling the EEOC to provide the alleged wrongdoer with notice and to permit possible conciliation.

*Id.* at 1323 (citations omitted).

 In the instant case, the Court finds "sufficient similarity between these claims to doubt the likelihood that conciliation would prove successful as to one where it had failed as to the other." *De Medina v. Reinhardt,*

such below.

686 F.2d 997, 1013 (D.C.Cir.1982). Ms. Hartman's EEOC filing put the Agency on notice and provided the opportunity for possible settlement. Moreover, like Ms. Hartman, each class member and intervenor bases her claim on the Defendant's failure to hire her, each alleges she was qualified for the positions sought, and each alleges that the Defendant denied her employment on the basis of her gender. The Court concludes that the class members' and intervenors' complaints are similar enough to those of Ms. Hartman that the individual filing of multiple EEOC complaints was not necessary, nor would it have been efficient. As the Court of Appeals for this Circuit has observed, "[a]lthough the specific circumstances giving rise to the grievances of each of the plaintiffs and the would-be intervenors in this case are distinguishable, each of the employees [seeks to show] the same thing: a pervasive 'pattern and practice' of racial discrimination" in hiring throughout the Agency. *Cook v. Boorstin,* 763 F.2d 1462, 1466 (D.C.Cir.1985).

In sum, the Court finds that the Petitioners' Motion to Intervene meets all four requirements for Rule 24(a) intervention of right.[6] Accordingly, the Court shall grant the Petitioners' Motion. The Court notes that intervention here has "the virtues of conserving judicial resources and of avoiding the risk of inconsistent sequential adjudications of the critical issues." *Hill v. Western Electric,* 672 F.2d 381, 387 (4th Cir.), *cert. denied,* 459 U.S. 981, 103 S.Ct. 318, 74 L.Ed.2d 294 (1982). Moreover, the Court finds that the intervenors need not exhaust their administrative remedies before filing suit in federal court, as their complaints are sufficiently similar to that of Plaintiff Hartman who did follow requisite administrative procedures before filing a complaint with this Court.

## II. *THE COURT FINDS THAT CERTIFICATION OF THE PLAINTIFF CLASS IS PROPER*

Rule 23 of the Federal Rules of Civil Procedure sets forth the standards for class certification. A class may be certified when: (1) the class is so numerous that joinder of all members is impracticable, (2) there are questions of law or fact common to the class, (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class, and (4) the representative parties will fairly and adequately protect the interests of the class. Fed.R.Civ.P. 23(a). A "shorthand way of combining [these] requirements is to ask whether a class action would serve as an efficient method of litigating the issues in the case." *Duggan v. Bowen,* 691 F.Supp. 1487, 1502 (D.D.C.1988) (citing *McCarthy v. Kleindienst,* 741 F.2d 1406, 1410–11 (D.C.Cir. 1984)). In addition, a party seeking certification under Fed.R.Civ.P. 23(b)(2), as in the instant case, must also be able to show that those opposing the class acted or refused to act on "grounds generally applicable to the class, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the class as a whole."[7] The Plaintiffs satisfy these criteria.

In reviewing class certification in the instant case, the Court of Appeals focused on the commonality and typicality requirements of Rule 23(a), and characterized "[t]he question ultimately [as being] whether members of the plaintiff class—whether foreign service or civil service applicants—share a *common injury.*" *Hartman,* 19 F.3d at 1472. The Court recognized that, normally, a Plaintiff

---

**6.** The Petitioners argue, in the alternative, that they are entitled to permissive intervention pursuant to Rule 24(b) of the Federal Rules of Civil Procedure. Permissive intervention may be granted "when an applicant's claim or defense and the main action have a question of law or fact in common." Fed.R.Civ.P. 24(b). In ruling on a motion for permissive intervention, "the court [must] consider whether the intervention will unduly delay or prejudice the adjudication of the rights of the original parties." *Id.* Although the Court need not reach the issue of permissive intervention because it finds that the Petitioners are entitled to intervene as of right, the Court observes that permissive intervention would also be proper in this case, because the Petitioners, as class members, assert claims that share common issues of law and fact with the main action, and because intervention will facilitate disposition of this case without prejudicing either party's rights.

**7.** The Defendant has not challenged the Plaintiffs' ability to meet this criterion.

lacks standing to challenge a test or requirement unless she or he was injured by that test or requirement. *Id.* at 1471. In the instant case, the Plaintiffs challenge both the foreign service and the civil service hiring procedures. However, the Court of Appeals explained that "given sufficient proof, an unsuccessful applicant for one particular job can presumably challenge discriminatory hiring for different job categories where the primary practices used to discriminate in the different categories are themselves similar." *Id.* at 1472. Thus, notwithstanding the Defendant's argument that certification is improper here because two personnel systems are at issue, certification of the Plaintiff class is proper if the Plaintiffs make "a 'specific presentation' identifying the questions of law or fact common to the class representative and the members of the class proposed." *Wagner v. Taylor,* 836 F.2d 578, 589 (D.C.Cir.1987). The Court finds that the Plaintiffs have made such a showing.

■■■■ Commonality is satisfied where the "plaintiffs' claims revolve around questions of law that will affect all members of the potential class." *Littlewolf v. Hodel,* 681 F.Supp. 929 (D.D.C.1988), *aff'd,* 877 F.2d 1058 (D.C.Cir.1989), *cert. denied,* 493 U.S. 1043, 110 S.Ct. 837, 107 L.Ed.2d 832 (1990). The rule "does not require that every question of law or fact be common to every member of the class." *Paxton v. Union National Bank,* 688 F.2d 552, 561 (8th Cir. 1982), *cert. denied,* 460 U.S. 1083, 103 S.Ct. 1772, 76 L.Ed.2d 345 (1983) (citations omitted). Consequently, "factual variations are not sufficient to deny class treatment to the claims that have a common thread of discrimination." *Id. See also Cox v. American Cast Iron Pipe Co.,* 784 F.2d 1546, 1557 (11th Cir.), *cert. denied,* 479 U.S. 883, 107 S.Ct. 274, 93 L.Ed.2d 250 (1986) (class certification proper where plaintiffs represented employees in 49 job categories and alleged discriminatory treatment in compensation, promotion, medical coverage, and training, through overt discrimination, word-of-mouth recruiting, and subjective evaluations). As discussed in detail below, the Court finds that commonality and typicality exist in the instant case despite the inclusion of differing job categories or factual differences among the various manifestations of discrimination alleged by the Plaintiffs.

■■■ As a preliminary matter, the Court must briefly address the parties' disagreement over the proper interpretation of the Court of Appeals' instructions regarding the scope of the evidence that this Court may consider in addressing the class certification issue on remand. The Court of Appeals clearly stated that the first question before this Court should be whether the certification back in 1978 was proper. *Hartman,* 19 F.3d at 1474. The Court added, however, that

[e]ven if class certification back in 1978 was premature, it may nonetheless be proper now. The district court would have to ask whether the evidence currently supporting class certification *could only* have been developed *as a result* of the initial (improper) decision to certify the class. Evidence that *could not have* entered the district court's ken except as a result of class certification should presumably not factor into an *ex post* decision of whether class certification was proper.

*Id.*

The Plaintiffs contend that this statement refers only to the question of whether the 1978 class certification was proper. With regard to whether class certification is appropriate now, the Plaintiffs assert that this Court may consider evidence not before the Court in 1978, namely, additional affidavits and anecdotal evidence, including information presented by the proposed intervenors. Plaintiffs' Memorandum of Points and Authorities in Support of Class Certification, filed May 26, 1994, at pp. 8–10. In contrast, the Defendant argues that, according to the Court of Appeals, this Court may only examine the record as of the 1978 class certification and the 1979 liability trial in its review on remand of *both* the original class certification back in 1978 *and* the issue of class certification now. Defendant's Amended Memorandum of Points and Authorities in Support of Defendant's Motion to Decertify the Applicant Class, filed June 14, 1994, at pp. 19–22.

The Court of Appeals provided further direction on this issue, however, stating that it

"would *not* expect that premature class certification would have undermined *any* other evidence which *might* support class certification now." *Id.* at 30 (emphasis added). Thus the Court of Appeals anticipated that if this Court finds on remand that class certification was premature in 1978, such a finding would not affect the use of any relevant evidence before the Court on the issue of class certification at this time. The Court of Appeals advised against relying on the 1979 trial statistics, as it "would be uncomfortable in resting on the trial statistics in the present record for a final determination of commonality," and cited cases for comparison in which anecdotal testimony, affidavits, and memoranda concerning an employer's subjective standards for advancement were found to support a determination of commonality. *Id.* at 1473.[8] Finally, the Court of Appeals advised this Court that it "may also consider creating sub-classes, certifying a narrower class, or adding additional class representatives" on remand. *Id.* at 1474.

The only manner in which this Court can give effect to the language of the Court of Appeals would be to consider evidence outside the record as it existed in 1978 and 1979, including the parties' briefs on the certification and intervention issues and the sworn declarations and other materials contained therein. Therefore, in determining whether class certification is proper now, the Court will consider the record as it existed in 1978 and 1979, as well as any additional evidence, including relevant anecdotal testimony, affidavits, and memoranda concerning the Defendant's alleged discriminatory policies that have been submitted to the Court in connection with its reconsideration of class certification on remand.

## A. The Record Demonstrates that the Class was Properly Certified in 1978

■ Pursuant to the Court of Appeals' instructions, this Court shall first address the issue of whether the class was properly certified in 1978. The Court observes at the outset, however, that the seminal question on remand is whether certification of the Plaintiff class is proper now, as the resolution of that issue will dictate the outcome of this Court's determination, notwithstanding any finding with respect to the 1978 class certification.

In April 1978, this Court certified the class. After the 1979 bench trial, the Court modified the class to exclude all clerical employees, and dismissed the class retaliation and promotion claims. *Hartman v. Wick*, 600 F.Supp. 361 (D.D.C.1984). This modification narrowed the class such that it no longer resembled the "across-the-board" class which the Supreme Court declined to affirm in *General Tel. Co. v. Falcon*, 457 U.S. 147, 102 S.Ct. 2364, 72 L.Ed.2d 740 (1982). *Hartman*, 19 F.3d at 1470. Still, the Court of Appeals characterized the key question to address on remand as whether this Court erred in originally certifying the class of all women who have applied for employment at the USIA and who have been or continue to be adversely affected by the USIA's discriminatory employment practices. *Id.* at 1470–71. In addressing this question, this Court shall consider the original complaint and motions for class certification, along with the evidence presented during the course of the liability trial.

With regard to the propriety of class certification in light of the evidence presented at the 1979 bench trial, the Court finds that the record contained sufficient findings of com-

---

**8.** The Court of Appeals cites to the following cases: *Carpenter v. Stephen F. Austin State Univ.*, 706 F.2d 608, 617 (5th Cir.1983) ("The statistical proof of channeling ... and the anecdotal testimony of female ... employees presented at trial set forth common issues of law and fact"); *Cook v. Boorstin*, 763 F.2d 1462, 1472 (D.C.Cir.1985) ("Plaintiffs in this case appear to have met the [commonality and typicality] requirement amply by presenting affidavits and memoranda suggesting that the [employer]'s subjective standards for advancement have resulted in systematic discrimination against blacks and other minori-

ties."); *Griffin v. Carlin*, 755 F.2d 1516, 1532 (11th Cir.1985) ("22 named plaintiffs had alleged sufficiently diverse employment practices that the court might infer that discriminatory treatment was typical of defendant's promotion practices and that defendant's promotion practices were motivated by a pervasive policy of racial discrimination"); *Bishop v. New York City Department of Housing Preservation and Development*, 141 F.R.D. 229 (S.D.N.Y.1992) (finding that statistical and anecdotal evidence supported commonality claim).

monality and typicality to support its decision to certify the modified class. Following the original class certification, four named Plaintiffs were added through intervention, and the Court held evidentiary hearings on liability. At the trial, the Plaintiffs presented evidence of numerous subjective and discriminatory practices utilized to choose among applicants, including the use of overt sexist comments in denying positions to females, preferences for males in full time jobs at the USIA, the subjective application of hiring criteria, unfair testing procedures, active discouragement of females from pursuing jobs at the USIA, concealment of vacancies by hiring officials from qualified females, and the preselection of male candidates for positions sought by women. *See* Plaintiffs' Memorandum of Points and Authorities in Opposition to Defendant's Motion to Decertify the Class, filed June 10, 1994, at pp. 10–12.

The Court of Appeals made clear that this Court cannot rely on trial statistics to support its decision to certify the class. The individual representations of the various women who testified at trial, however, constitute anecdotal testimony which sets forth common issues of fact as required by Rule 23(a). Here, these women's allegations that they suffered a common injury, that is, the denial of jobs on the basis of their gender, is sufficient to support a finding of class certification.

In its briefs, the Agency raises various arguments in support of its position that certification of the Plaintiff class in 1978 was not proper, many of which are similar to those raised with regard to whether class certification is proper now. Because the determination of whether class certification was proper in 1978 is not conclusive with respect to the practical outcome of the Court's inquiry on remand, however, the Court shall move on to address the determinative issue of whether class certification is proper now.

## B. *The Record Demonstrates that Certification of the Class is Proper now*

■ Under the standard enunciated by the Court of Appeals, class certification is proper in the instant case if the Plaintiffs have made a specific presentation of subjective employment practices that cut across the job categories and inflict on class members a common injury. *Hartman,* 19 F.3d at 1472. As the cases cited by the Court of Appeals suggest, such a showing may be made through trial testimony, affidavits, and anecdotal and statistical evidence. *Id.* at 1473. Moreover, the Court may also consider the proposed intervention of additional class representatives in making this determination.[9] *Id.* at 1474.

The Plaintiffs assert that the USIA pursued a policy of intentional sex discrimination against female applicants for all the jobs at issue in this case. In order to demonstrate that the discriminatory effects of this policy were commonly experienced by applicants for all six jobs at issue, the Plaintiffs identify four major discriminatory practices that cut across all job categories: (1) overt discrimination and express limitations on the employment of women; (2) disparate application of subjective criteria to deny women positions, including biased evaluations of tests and credentials; (3) discouragement of female applicants, including the failure to respond to their applications; and (4) the use of discriminatory recruitment devices, including preselection of men, to avoid hiring qualified women.

The Court finds that, based on the record previously established in this case, along with sworn declarations of class members, these discriminatory practices have adversely affected female applicants throughout all jobs at issue here. Thus, commonality and typicality are established and class certification under Rule 23(a) is warranted.

9. The Defendant argues that, before the Court decides the class certification issue, the Agency is entitled to conduct limited discovery on the accuracy of the Plaintiffs claim that typicality and commonality are present. Defendant's Amended Memorandum of Points and Authorities in Opposition to Plaintiffs' Request to Certify the Applicant Class, filed June 14, 1994, at p. 71. In a teleconference on September 7, 1994, however, counsel for both parties stipulated that the current record is sufficient for the Court to make a determination regarding the propriety of class certification under Rule 23(a). Accordingly, the Defendant shall not be permitted to conduct further discovery on this issue.

**(1) THE PLAINTIFFS' SHOWING OF SPECIFIC DISCRIMINATORY PRACTICES COMMON TO THE CLASS SATISFIES THE RULE'S COMMONALITY CRITERION**

██ With regard to each of the four discriminatory practices listed above, the Plaintiffs have provided detailed anecdotal evidence, gleaned from the trial record and additional sworn testimony, which demonstrates that class members suffered from a common policy of discrimination that pervaded all the hiring decisions at issue. The Court has revisited the entire record to examine independently the claims addressed in the Plaintiffs' briefs, and confirm that common issues of law and fact exist to support class certification at this time. The Court concludes that the Plaintiffs have shown a clear pattern of discrimination in hiring practices across all six job categories.

The Court first observes that the Defendant takes great pains to go through the trial record and rebut each class member's claim regarding these discriminatory employment practices. As the Supreme Court has held, however, a district court should not "conduct a preliminary inquiry into the merits of a suit in order to determine whether it may be maintained as a class action." *Eisen v. Carlisle & Jacquelin*, 417 U.S. 156, 177, 94 S.Ct. 2140, 2152, 40 L.Ed.2d 732 (1974). In other words, the question "is not whether the plaintiff or plaintiffs have stated a cause of action or will prevail on the merits, but rather whether the requirements of Rule 23 are met." *Id.* As detailed in the Appendices to this Opinion, the record before the Court clearly shows that common issues of law and fact exist among applicants, thereby permitting "the additional inference that class members suffered a *common* injury." *Hartman*, 19 F.3d at 1472. The Court thus finds at the outset that the Agency's discussion of the merits of the class members' claims is not relevant to the Court's inquiry under Rule 23(a).[10]

**(a) The record reveals that class members commonly experienced overt discrimination through the Agency's placement of explicit limitations on the employment of women, and through its employees' expression of stereotypical views of women.**

The Plaintiffs persuasively demonstrate that a pattern of overt discrimination and express limitations on the employment of women existed with regard to the USIA's hiring practices. The Plaintiffs have presented the testimony of many class members who allege that they applied for positions but were turned down because, they were told, the Agency had a preference for males in a particular position. Many applicants also describe discriminatory remarks made to them by Agency employees during the application process which evidence inappropriate and stereotypical views of women.

For example, class members were told upon applying for positions that the Agency needed "a balance of voices," that the Agency was seeking males to fill particular positions, that employment might have a negative effect on an applicant's marriage, that there were "enough women in the Foreign Service at mid-level," that men had to be hired first, that hiring a female would incur additional travel expenses for the Agency, that technical jobs were "mainly for men," that a woman's place was "at the stove, not on the air," that it is not good procedure to have too many women, that the Agency was looking for "male voices," that one supervisor did not want "that many girls around," that a broadcaster position was not a good idea for an applicant with small children, and that one applicant should stay home and take care of her baby. *See* Appendix A. The Plaintiffs allege that, as a result of this discrimination,

---

**10.** The Agency also argues that because the Plaintiffs do not specifically allege a "practice or policy" of discrimination, their claims lack commonality. Defendant's Opposition, at p. 29. However, the Agency misunderstands the relevant inquiry. Commonality may be shown through allegations that the employers' discrimination in hiring practices manifested itself "in the same general fashion." *Falcon*, 457 U.S. 147, 159 n. 15, 102 S.Ct. 2364, 2371 n. 15. Thus each Plaintiff need not allege that the same discrete practice or policy existed. Rather, the individual acts of discrimination cited by the Plaintiffs "could very likely be manifestations of such a policy." *Cox*, 784 F.2d at 1557.

class members were denied jobs in each of the job categories.

Based on the extensive anecdotal evidence proffered by members of the Plaintiff class, including intervenors, the Court finds that a common thread exists of express limits on the hiring of women and the articulation of stereotypical views of women to female applicants, that demonstrates the commonality of law or fact required for Rule 23(a) certification.[11]

**(b)** *The record reveals that class members were commonly subjected to gender-biased evaluations and discriminatory application of subjective criteria by the Agency.*

The Plaintiffs further allege that the USIA subjected women applicants to biased evaluations and used subjective criteria to deny women positions on the basis of their sex. Plaintiffs' Memorandum, at p. 32. Tests were administered in the hiring process for several positions at issue, including Foreign Language Broadcaster/International Radio Broadcaster, Radio Broadcast Technician, and Foreign Service Information Officer/Foreign Service Officer, as well as some Writer/Editor positions. *Id.* The Plaintiffs allege that, throughout the administration of each of the tests implicated here, the Agency's predominantly male selecting officials and test graders undervalued the experience of female applicants, assigned women lower test scores than their performance merited, applied subjective versus objective criteria in evaluating female applicants, and required additional materials and procedures of female applicants than were required of male applicants. *Id.* The Court finds that evidence of the USIA's use of gender-biased evaluations and discriminatory application of subjective criteria further supports the Court's determination that commonality exists here.[12] Notably, these discriminatory

practices cut across both civil service and foreign service positions, thereby addressing what the Court of Appeals considered to be "[t]he principal problem in the certification," that is, the fact "that it encompasses both civil service and foreign service applicants to the USIA, despite the fact that the two categories are hired under different personnel systems." *Hartman v. Duffey,* 19 F.3d at 1471.

For example, the applicants for Foreign Language Broadcaster/International Radio Broadcaster positions who took written and oral tests allege that because the grading did not ensure their anonymity, the graders were afforded the opportunity to use and apply subjective criteria to women's disadvantage. *See* Appendix B (*e.g.,* testimony of Rita Brown). Similarly, applicants for foreign service positions underwent written and oral testing before predominantly male graders who also allegedly used highly subjective criteria in their evaluations and exhibited unfair and hostile views toward female applicants. *Id.* (*e.g.,* testimony of Genevieve E. Huber and Donna L. Woolf). The Court finds that the evidence suggests that applicants to both civil service and foreign service positions were treated in a similarly condescending and inappropriate manner by Agency representatives, a finding which reveals yet another common discriminatory practice justifying class certification at this time.

At this juncture, the Court recognizes a need to address the Defendant's arguments regarding the nature of the Agency's hiring decision-making authority, as this issue relates to the Court of Appeals' concern over the two job categories. The Court of Appeals observed that foreign service officers must pass a general foreign service entry examination and undergo an oral assessment of their qualifications before they are hired by the USIA. *Id.* In contrast, civil service

**11.** Appendix A contains a detailed discussion of the claims of various women regarding express limits on hiring women and the stereotypical views of women enunciated to applicants by Agency representatives. This Appendix, along with Appendix B, was developed through the Court's independent study of the massive record before it, including in particular the information highlighted in the attachments to the numerous briefs submitted by the Plaintiffs and the Defendant Agency on the issue of class certification.

**12.** Appendix B contains a detailed discussion of the claims of various class members regarding the Agency's use of gender-biased evaluations and discriminatory application of subjective criteria.

applicants may apply directly to the Agency in response to vacancy announcements, without taking any preliminary examination. *Id.*

The Agency argues that the diversity of the selecting officials alleged to have discriminated against applicants, and the decentralization of the hiring decision-making authority, undermine class treatment here. Defendant's Memorandum, at p. 37. In particular, the Agency argues that the USIA has virtually no role in the selection process for foreign service officer applicants, and must simply accept foreign service applicants according to their rank-ordered score on the cumulative examination process. *Id.* at 40–41. Thus the USIA further contends that there is no hiring policy or practice that is common to the positions at issue in this suit, and concludes that the Plaintiffs therefore cannot show the existence of a " 'common policy of discrimination that pervaded all of the employer's challenged employment decisions.' " *Id.* at 42 (quoting *Hartman,* 19 F.3d at 1472).

The Court agrees with the Defendant's ultimate characterization of the issue at hand, that is, whether the Plaintiffs can show the existence of a common policy of discrimination that pervaded all of the employer's challenged employment decisions, which include those made with respect to civil service *and* foreign service positions. The Court disagrees, however, with the Defendant's contention that because employment decisions were made by a number of individuals in a number of job categories, the Plaintiffs cannot possibly show commonality. The Court of Appeals explicitly addressed the Plaintiffs' challenge to the USIA's hiring decisions under both the civil service and the foreign service personnel systems and, significantly, found that where the *primary practices* used to discriminate in the different categories are themselves similar, an applicant for one particular position can challenge discriminatory hiring for other job categories. *Hartman,* 19 F.3d at 1471. The Court of Appeals continued:

> In other words, we are unwilling to hold as a matter of law, that a named plaintiff who unsuccessfully applied for one job can never represent an employee who unsuccessfully applied for another job simply because the application process for the second job included a separate and different element. Indeed such a restriction would permit an employer to defeat the broad enforcement of Title VII simply by administering different objective tests as part of the application process for each job ... The fact that the ... USIA's hiring of foreign service officers differs in *some* respects from hiring of civil service officers, does not in itself preclude the named plaintiffs from representing the entire class.

*Id.* at 1472.

The Court finds that the Plaintiffs have demonstrated that the primary practices allegedly used to discriminate against women applicants cut across all job categories, including foreign service positions. As Appendices A and B demonstrate, class members who applied for *both* civil service positions and foreign service positions claim to have been subjected to the same or similar discriminatory practices. In addition, because these women were all denied positions with the Defendant as a result of these practices, they all suffered a common injury. The Court finds that this showing meets the commonality requirement of Rule 23(a).

The Court observes that, in addition, the record reveals that the foreign service hiring is in fact controlled by the Agency. *Hartman v. Wick,* 678 F.Supp. at 321–22 ("There is no question that the Board of Examiners, which conducts and evaluates foreign service examinations, is not controlled by the State Department but is an inter-agency board on which USIA officials serve as equal partners."). It is undisputed that the hiring decision-making for foreign service positions is not completely separate from that for civil service positions. Indeed, the Defendant explains that the USIA has consulted with the Board of Examiners for the Foreign Service regarding the types of questions to be included on the written exam, that USIA officials serve as deputy examiners who administer oral assessments to foreign service officer candidates, and that the USIA supplies information to the Board of Examiners regarding the number of foreign service officer positions that it anticipates filling during the next fiscal year. Defendant's Memorandum, at p.

41 n. 15. Thus the Defendant's own explanation of the USIA's role in foreign service hiring belies its equivocal claim that the foreign service personnel process is "nearly completely separate" from the Agency. *See id.* at 41.

The Court reiterates, however, that the issue here is not the extent to which fusion of the official mechanics of the hiring processes exists, but whether the discriminatory practices alleged by the Plaintiffs cut across both personnel systems. The record demonstrates claims common to applicants for jobs in both civil service and foreign service categories, i.e., that women's applications have been held to higher procedural and substantive standards than those of men, and that any required testing has been administered in a biased fashion. *See* Appendix B (compare statements of foreign service applicants Heilbronn, Huber, and Woolf with those of civil service applicants Berger, Serbu and Hasan). In addition, like class members who were rejected for civil service positions, several foreign service applicants allege that they were faced with express limitations on the employment of women and/or received stereotypical remarks about women when they were applying for foreign service positions. *See* Appendix A (compare statements of foreign service applicants Witt and De-Young with those of civil service applicants Hartman, Kem and Kreutz). Moreover, women applicants from both job categories allege that Agency employees actively discouraged their applications for particular positions. *See infra* Section II.B.(1)(c) (compare statement of foreign service applicant Witt with those of civil service applicants Kluger, Lind, and Goldman). Accordingly, the Court concludes that the Plaintiffs have successfully established the existence of recurring instances of discriminatory hiring practices that cut across job categories, thereby permitting the additional inference that the class suffered a common injury.

**(c)** *The Plaintiffs' claims that the Agency discouraged female applicants further support a finding of commonality.*

Further, the Plaintiffs identify the discouragement of female applicants for positions at the USIA as an additional category of discrimination that supports their contention that commonality existed across the six job categories. Plaintiffs' Memorandum, at pp. 52–66. The Court first observes that the evidence discussed above and in Appendices A and B regarding the Agency's placement of limitations on the hiring of women, its employees' expression of stereotypical views of women, and its use of gender-biased evaluations and discriminatory application of subjective criteria, alone suffices to demonstrate commonality under Rule 23. However, the Court finds that the trial record and supplemental testimony also contain common allegations regarding an Agency policy of discouraging female applicants. The Court concludes that this practice presents another common issue of fact which further supports a finding that the commonality criterion of Rule 23 is met and that class certification is proper.

The Plaintiffs demonstrate that women across job categories raise common issues of fact regarding discouragement from applying to the Agency. For example, one woman claims she was told she should "not bother applying," and another contends that she was told there were no "appropriate" positions available for a woman applicant where "there were enough women in the Foreign Service at mid-level." Declaration of Myrna Kluger, at ¶ 3 and Declaration of Shirley Hill Witt, at ¶ 10, respectively. Other women claim that they were told that the boss did not like to have "that many girls around," that one woman's application was thrown away as a "joke," and that they could not be hired without certain experience not demanded of other applicants. Declaration of Kathy Millard, at ¶ 3, Declaration of Jeannine Lind, at ¶ 5, and see Declaration of Lynn Goldman, at ¶ 5, respectively. The Court finds that this evidence of the Agency's alleged discouragement of female applicants further supports the Plaintiffs' claim that commonality is present among class members' claims.

**(d)** *The Plaintiffs' claims that the Agency used discriminatory recruitment devices and preselected men further support a finding of commonality.*

The Plaintiffs argue that the USIA also preselected male applicants and intentionally

used vacancy announcements to avoid hiring qualified females. The Plaintiffs claim that predominantly male service chiefs used word-of-mouth recruiting to hire males, that the Agency restricted vacancy announcements to the predominantly male workforce, that the Agency would close announcements early, permit males to apply after the posted closing date, or cancel the announcement and later reissue it in order to permit males to apply and to avoid female applicants, and that the Agency would preselect men through unusual qualifications, or decline to select women using unstated qualifications. Plaintiffs' Memorandum, at pp. 58–66.

At the remedial trial, Agency witnesses testified regarding the use of word-of-mouth recruiting by predominantly male chiefs of services and division heads. They also testified that section chiefs and division heads had substantial input into the design of vacancy announcements, affording them the opportunity to restrict the announcement's "area of consideration" to a predominantly male pool of employees. Moreover, the Court found against the Defendant with respect to named Plaintiff Rose Kobylinski's claims that the Agency preselected males for positions. *Hartman v. Wick,* 600 F.Supp. at 363–65. The Court finds that a sufficiently large number of other class members make similar claims, thereby providing another basis for finding that commonality exists under Rule 23(a).[13]

In sum, the Court concludes that the Plaintiffs have presented ample evidence that common issues of fact exist to support a finding that certification of the Plaintiff class at this time is proper under Rule 23. Moreover, the common discriminatory practices detailed above reveal a common injury, that is, the denial of employment through the Agency's use of discriminatory hiring techniques and stereotypical views of women. The Court shall thus turn to the question of typicality under Rule 23.

(2) *THE COURT FINDS THAT THE CLAIMS OF THE REPRESENTATIVE PARTIES, INCLUDING THE INTERVENORS, ARE TYPICAL OF THE CLAIMS OF THE CLASS*

In order for class certification to be proper, the claims of the representative parties must be typical of the claims of the class. Fed.R.Civ.P. 23(a). The Supreme Court has indicated that, in employment discrimination class actions, the elements of commonality and typicality "tend to merge." *Falcon,* 457 U.S. at 157 n. 13, 102 S.Ct. at 2370 n. 13. The Court explained, "[b]oth serve as guideposts for determining whether under the particular circumstances maintenance of a class action is economical and whether the named plaintiff's claim and the interests of the class members will be fairly and adequately protected in their absence." *Id.* Moreover, "typicality is not destroyed merely by 'factual variations'" between the named Plaintiff's claim and the class she seeks to represent. *Wagner v. Taylor,* 836 F.2d 578, 591 (D.C.Cir.1987) (quoting *Rowe v. Bailar,* 26 Fair Empl.Prac.Cas. (BNA) 1145, 1147, 1981 WL 372 (D.D.C.1981)). Rather, the court must consider "whether [the class representative] suffered injury from a specific discriminatory promotional practice of the employer in the same manner that the members of the proposed class did, and whether [the class representative] and the class members were injured in the same fashion by a general policy of employment discrimination." *Id.* (citations omitted). "The burden of showing typicality is not an onerous one." *Paxton,* 688 F.2d at 562. The Court finds that the claims of class representatives Kem and Hartman, and the claims of the intervenors, are typical of the Plaintiff class and support a finding that class certification is proper now.

In 1978, Ms. Carolee Brady Hartman filed suit on behalf of herself and all other persons similarly situated. The class was then condi-

---

**13.** *See, e.g.,* Declaration of Kay Templeton Garvey, at ¶ 5 (repeatedly notified that vacancy announcements had been cancelled then had to reapply when the announcements were readvertised later); Declaration of Lorraine Davis–Quick, at ¶ 14, and Declaration of Linda Coley, at ¶ 4–5 (told that their applications had been lost);

and Declaration of Carolyn Turner, at ¶¶ 8–9 (rejected for a position based on qualifications not reflected in the vacancy announcement; told by personnel official that vacancy announcement was open then informed by letter that it had closed before her conversation with personnel official).

tionally certified, and four other women later joined Ms. Hartman as named Plaintiffs in this action. On September 11, 1978, the Court ordered that Ms. Luba Medina, Ms. Rose Kobylinski and Ms. Josefina Martinez be permitted to intervene as named Plaintiffs in this action. Later, on November 9, 1978, the Court ordered consolidation of a separate Title VII action brought by Ms. Medina against the Defendant, and on November 22, 1978, Ms. Toura Kem's separate, individual Title VII action was consolidated with this action. The parties agreed that the trial of this case was to be bifurcated into a "liability" stage and a "relief" stage and that issues of entitlement to specific relief by individual members of the class would be postponed until a later stage in the proceedings.[14] The Court subsequently dismissed Ms. Medina's claim on the merits, *De Medina v. Reinhardt*, 21 Fair Empl.Prac.Cas. (BNA), 1979 WL 39 (D.D.C.1979), and entered judgment against the Defendant with respect to Ms. Kobylinski's individual claim of discrimination. *Hartman v. Wick*, 600 F.Supp. at 375.

The Court finds that, because only Ms. Kem and Ms. Hartman have active claims against the Agency, they are the only Plaintiffs whose status as class representative is currently at issue. Further, the Court determines that both Ms. Kem and Ms. Hartman present claims that are typical of the Plaintiff class.[15]

Ms. Kem avers that she sought a position as a Cambodian Broadcaster but was informed that there was "no need to hire another woman on the regular staff." *See* Appendix A. Thus, as is typical of class members, Ms. Kem claims that she was denied a job based on the Agency's express limitations on the employment of women. The Agency's comment dismissing the need to hire women also evidences a practice of discouraging female candidates from applying for positions, another thread of discrimination which is common to, and typical of, class members. She also alleges to have suffered the same injury, that is, the denial of employment based on her sex. Accordingly, she is a proper class representative and the typicality requirement of Rule 23 is met.

■ Ms. Hartman testified that she applied for a job but was told that there were too many women working on the staff. *See* Appendix A. Thus, like Ms. Kem, Ms. Hartman presents a claim that is typical of those of the class members—discrimination on the basis of sex evidenced through express limitations on the employment of women. In addition, she claims to have suffered the same injury, that is, she was denied employment because of her gender.

In *East Texas Motor Freight System v. Rodriguez*, 431 U.S. 395, 403–404, 97 S.Ct. 1891, 1896–97, 52 L.Ed.2d 453 (1977), the Supreme Court reviewed a district court's finding, made "upon abundant evidence[,] that the[ ] plaintiffs lacked the qualifications to be hired," and held that such plaintiffs were "not eligible to represent a class of persons who did allegedly suffer injury." The Defendant argues that the Court has already concluded that Ms. Hartman was not qualified for the position she sought and that, in turn, this finding conclusively undermines this Court's determination of the typicality issue. Defendant's Memorandum, at p. 47. *See De Medina*, 1979 WL 39, *6 (discussing defense testimony regarding Ms. Hartman's professional experience).

The Court finds, however, that Ms. Hartman was not found "upon abundant evidence" to be unqualified for the position she sought.[16] In fact, unlike the district court in

---

**14.** In *Teamsters*, the Supreme Court explained, "at the initial, 'liability' stage of a pattern-or-practice suit the [plaintiff] is not required to offer evidence that each person for whom it will ultimately seek relief was a victim of the employer's discriminatory policy." *International Brotherhood of Teamsters v. United States*, 431 U.S. 324, 360, 97 S.Ct. 1843, 1867, 52 L.Ed.2d 396 (1977).

**15.** The Court observes that, although it dismissed Ms. Medina's discrimination claims, she was a proper class representative when the class was modified in 1979. Indeed, in its 1982 memorandum to the Court, the USIA conceded that Ms. Medina "was a proper representative of the class at the time of certification...." *See* Defendant's Memorandum to the Court, filed November 24, 1982.

**16.** Indeed, the Plaintiffs observe that the Agency's personnel management specialist actually determined that Plaintiff Hartman was qualified for Writer/Editor positions at the GS–11 and 12 levels, and that these levels are the equivalent of

*Rodriguez,* this Court neither heard nor made a final determination on the merits of Ms. Hartman's individual claim. Ms. Hartman's claim, like those of every other class member who applied for a civil service position, is subject to an individual *Teamster* hearing before the Special Master. Rather, in *De Medina,* this Court addressed the issue of "[w]hether the defendant's hiring, promotion and salary practices constitute patterns or practices of discrimination based on sex in violation of Title VII...." *De Medina,* 1979 WL 39, *2. Accordingly, the Court concludes that *Rodriguez* does not preclude a finding that Ms. Hartman is a proper class representative now.

■ The Defendant further argues that Ms. Hartman lacks standing to raise issues concerning either gender-biased evaluations and discriminatory application of subjective criteria, or the alleged discouragement of female applicants, because she was not subjected to these employment practices. Defendant's Opposition, at p. 16. The Court finds, however, that just because Ms. Hartman did not experience each and every manifestation of the alleged policy of discrimination does not mean she lacks standing to represent class members on their individual claims. Although "a class representative must be part of the class and 'possess the same interest and suffer the same injury' as the class members," *Rodriguez,* 431 U.S. at 403, 97 S.Ct. at 1896 (quoting *Schlesinger v. Reservists Committee to Stop the War,* 418 U.S. 208, 216, 94 S.Ct. 2925, 2930, 41 L.Ed.2d 706 (1974)), the factual variations between Ms. Hartman's claims and those of other class members do not destroy typicality. *Wagner,* 836 F.2d at 591. The Court finds that, because Ms. Hartman shares a common injury with members of the Plaintiff class, namely, she suffered the denial of a position with the Defendant agency as a result of sex

discrimination, she is an appropriate class representative.

In response to the Court of Appeals' suggestion that the Court may add additional class representatives in consideration of class certification on remand, the Court further finds that the intervenors' claims are typical of those of class members, and thus satisfy Rule 23(a). In the Petitioners' Complaint in Intervention, filed April 29, 1994, each woman alleges discrimination on the basis of sex, as evidenced by the Agency's express limitations on the employment of women, its employees' expression of stereotypical views of women, the use of gender-biased evaluations and subjective criteria, the discouragement of female applicants, and/or the use of discriminatory recruitment devices and the preselection of men. Each was denied employment, they allege, based on the Agency's discriminatory policies. Moreover, among the intervenors are applicants for positions in both the civil service and foreign service categories. Accordingly, having considered the intervenors' claims along with those of Ms. Kem and Ms. Hartman, the Court finds that the typicality requirement of Rule 23(a) is clearly and abundantly met.

## (3) *THE COURT FINDS THAT THE NAMED PLAINTIFFS ADEQUATELY REPRESENT THE CLASS*

Finally, Rule 23(a) class certification requires a showing that the representative parties will fairly and adequately protect the interests of the class. Fed.R.Civ.P. 23(a).[17] The Defendant argues that there are many actual and potential conflicts within the class which place the adequacy of representation in jeopardy.[18] Defendant's Memorandum, at p. 50. The Defendant reasons that because there are many foreign service class members competing to fill the 39 foreign service positions the Court set aside, a conflict exists within the class that undermines the adequa-

the position she sought. Plaintiffs' Memorandum, at p. 30.

**17.** The Defendant does not dispute that the numerosity requirement of Rule 23(a) is met here. *See* Defendant's Memorandum, at p. 50 n. 16. The Defendant cautions the Court, however, to be "watchful" of the possibility that the Plaintiffs will be unable to show the existence of a class or that it is numerous. *Id.* The Court has consid-

ered the Defendant's warning and finds that there is no issue as to whether the class is so numerous that joinder is impracticable. *See* Fed. R.Civ.P. 23(a).

**18.** The Agency concedes that it does not challenge the adequacy of the Plaintiffs' counsel. Defendant's Memorandum, at p. 50.

cy of representation. *Id.* Moreover, the Defendant asserts, if the Court finds that class certification is proper and the case proceeds to the relief stage requiring individual *Teamsters* hearings, there may be conflicts between class members regarding selection for particular positions.

The Court finds no merit to the Defendant's reading of the possible problems with adequacy of representation during the relief phase of this litigation. First, as the Plaintiffs point out, the Defendant failed to raise any argument regarding adequacy of representation on appeal. Having reviewed the Defendant's appellate brief, the Court finds that the Defendant only challenged the Court's findings with respect to the commonality and typicality requirements of Rule 23(a). The Court of Appeals thus framed the questions for remand according to the commonality and typicality criteria. *See Hartman,* 19 F.3d at 1474 ("[t]he question ultimately is whether members of the plaintiff class ... share a common injury.") Consequently, the Defendant cannot now raise arguments regarding another prong of Rule 23(a), as "all viable arguments [must] be vigorously pursued throughout the proceedings, thereby allowing for earlier decision, rather than permitting parties to pick and choose which claims will be presented on appeal and which will be held back until a later time." *Washington Post Co. v. United States Department of Health and Human Services,* 865 F.2d 320, 327 n. 9 (D.C.Cir. 1989). *See also Williamsburg Wax Museum, Inc. v. Historic Figures, Inc.,* 810 F.2d 243, 250 (D.C.Cir.1987).

Second, the Agency offers no legal support for its argument that actual or potential conflicts exist among class members who must compete for the same job, such that adequacy of representation is necessarily defeated. As one court reasoned, "[t]hat absurd proposition would of course doom almost every *class* action charging discrimination in promotion [or hiring]—a drastic rewrite of the law in this area." *Meiresonne v. Marriott Corporation,* 124 F.R.D. 619, 625 (N.D.Ill.1989). The fact that there are not enough positions at the Agency to accommodate every class member participating in the remedial phase of the litigation does not show that representation of the class is inad-

equate. *See Simmons v. City of Kansas City, Kansas,* 129 F.R.D. 178, 180 (D.D.Kan. 1989). Rather, it merely highlights "the inevitable factual variations among named plaintiffs and potential class members." *Id.* at 180. Accordingly, the Court finds that the class representation is adequate for purposes of Rule 23(a).

### CONCLUSION

Upon consideration of the parties' briefs filed on the issues of intervention and class certification, the oral arguments of counsel at the September 1, 1994 hearing, the Court of Appeals' instructions in *Hartman v. Wick,* 19 F.3d 1459 (D.C.Cir.1994), the applicable law, the entire record in this case, and for all of the reasons articulated herein, the Court has determined that the Petitioners' Motion to Intervene shall be granted and the Defendant's Motion to Decertify the Applicant class shall be denied. The Court finds that the evidence set forth in the current record leads to the conclusion that intervention and certification of the applicant class is proper at this time. The Petitioners are entitled to intervention of right in this matter because they have met all four factors of Rule 24(a): timeliness, interest, practical impairment, and inadequacy of representation. With regard to the class certification issue, the Court finds that the detailed anecdotal evidence set forth in Appendices A and B of this Memorandum Opinion demonstrate that common issues of law and fact exist amongst class members' claims, and that the claims of the original and additional class representatives are typical of those of the Plaintiff class, thereby justifying class certification under Rule 23(a) at this time.

Accordingly, the Petitioners' Motion to Intervene shall be granted and the Defendant's Motion to Decertify shall be denied.

### APPENDIX A

*ANECDOTAL TESTIMONY DESCRIBING OVERT DISCRIMINATION AND EXPRESS LIMITATIONS ON THE EMPLOYMENT OF WOMEN IN CIVIL SERVICE AND FOREIGN SERVICE POSITIONS*

1. *Toura Kem.* Ms. Kem is a named Plaintiff who testified at the 1979 liability

trial that she sought a position as a Cambodian Broadcaster, but was told by the Chief of the Cambodian Service in 1969 that there was "no need to hire another woman on the regular staff" despite her long-standing service as a purchase order vendor, or freelance contractor. Kem Testimony, Tr. 5/30/79, at 170. Ms. Kem was not hired for a full-time position, but two males were hired just prior to her leaving the Service in 1976. *Id.* at 174.

2. *Cecilia Kreutz.* Ms. Kreutz, a well-qualified applicant for a broadcaster position, testified in a deposition admitted into evidence at the liability trial that she was told by the Chief of the Polish Service that, "In the radio, as you know by working in radio, you have to have a balance of voices." Deposition Excerpt of Cecilia Kreutz, at 58, Tr. 5/29/79, at 6–10. When Kreutz pressed for clarification, the Chief explained, "[I]f you have too many women, then it's not a very good procedure." *Id.* At the time of her applicant, the Polish Service employed more men than women as broadcasters. *Id.* at 59. She was denied a full-time position as a broadcaster, although a man was hired. *Id.* at 64–65.

3. *Vukosava C. Hodzic.* Ms. Hodzic testified in a deposition admitted into evidence at the liability trial that she applied for a broadcaster position with the Yugoslav Service in 1977 and 1978. Although qualified, the acting Chief of the Yugoslav Service told her the Service was looking for "male voices" and a "female voice" would not be suitable. Declaration of Vukosava C. Hodzic, at ¶ 4. On her third attempt for a full-time position, Ms. Hodzic was brought on not as a full-time employee, but as a purchase order vendor without the attendant salary, benefits and seniority. *Id.* at ¶ 7. She claims she was told by the acting Chief that her broadcast duties would be related to material concerning social issues, entertainment features, and fashion, while the more important issues such as news, politics, and international happenings would be better accepted by the audience if a male announcer read them. *Id.*

4. *Elena Tsypkin.* Ms. Tsypkin is a class members who sought a position as a broadcaster with the Russian Service and passed the requisite test. Upon inquiring about the status of her application, she was told that the Service "needed more male Russian voices." Declaration of Elena Tsypkin, at ¶ 5. She was not hired. *Id.* at ¶ 6.

5. *Marianna R. Serbu.* Ms. Serbu is a class member who sought a position as a broadcaster with the Romanian Service. She claims that the Chief of the Romanian Service told her he would rather hire her husband, that men were preferred for the position, and that "her place as a woman was at the stove, not on the air." Declaration of Marianna R. Serbu, at ¶ 5.

6. *Rita Brown.* Ms. Brown's deposition was admitted into evidence at the liability trial. She was a long-time personnel and administrative officer at the Voice of America ("VOA") who testified that female broadcasters were often not permitted to voice hard news, but were restricted to roles as M.C., although men also filled that role in circumstances where the M.C. position was "more the anchorman in American style." Deposition Excerpt: R. Brown Deposition, at 113–14, Tr. 5/29/79, at 6–10. The M.C. role was otherwise assigned to women "because they needed to show a balance of voices . . . if you had a predominantly male show, you needed to have a woman's voice breaking up the monotony of predominantly male voices." *Id.* at 113–14. Service chiefs justified bringing women on in a purchase order capacity "because you have a predominantly male staff and you want a balance of voices." *Id.* at 115.

7. *Irma Perez Murphy.* Ms. Murphy is a class member who sought a position as an International Radio Broadcaster and was called to the Agency for an interview. She claims that, during the interview, an Agency official told her that VOA already had enough women in the organization and that they needed a balance of men and women. Declaration of Irma Perez Murphy, at ¶ 3. She was told that they were seeking to fill the position with a man. *Id.*

8. *Kathy Millard.* Ms. Murphy is a class member who sought a position as a Hungarian broadcaster. She claims that, during an interview, an Agency official told her that his

supervisor did not want "that many girls around." Declaration of Kathy Millard, at ¶ 3. The official also referred to a very experienced female journalist as "an old broad." *Id.*

9. *Etel Berger.* Ms. Berger testified in her deposition, which was admitted into evidence at the liability trial, that, on numerous occasions, she discussed with the Brazilian Branch Chief the possibility of obtaining a full-time position as a broadcaster in the Brazilian Service. Deposition Excerpt of Etel Berger, at 33–35, Tr. 5/29/79 at 6–10. The Chief told her, "Etel, you have small children. You have responsibilities. I don't think it is a very good idea now." *Id.*

10. *June Drake.* Ms. Drake is a class member who applied for a position as an International Radio Broadcaster (English) with Voice of America. Ms. Drake claims that, after being rejected for the position, she was told that her application would remain active. Declaration of June Drake, at ¶ 2. She later contacted the Agency to inquire about other positions, but was told that "most of the positions were held by males, but infrequently female positions became available also." *Id.* at ¶ 5.

11. *Carolee Brady Hartman.* Ms. Hartman is a named Plaintiff who claims she was interviewed by the Editor of an Agency magazine, Mr. Robert Korengold, in connection with an impending vacancy for a writer on that magazine. At the liability trial, she testified that the Editor told her

> that he had 15 women working on the staff of that magazine and that there were too many women. He said that he wanted to fill the position with a man, because the person who was leaving was a man, and that would mean there would be no men working on the magazine, and that he intended to hire a man for the position. Tr. 5/29/79 at 35.

The Editor conceded at the trial that he told Ms. Hartman about an upcoming vacancy for a writer, which would come open after he left the magazine, and that "[they] were looking for a man to fill it." Tr. 5/31/79 at 185–86.

12. *Kay T. Garvey.* Ms. Garvey was a qualified writer applicant who claims that she was asked whether travel would be a problem since she was married, whether her husband would allow her to travel, and whether she would have a problem working and being married. Declaration of Kay Templeton Garvey, at ¶ 6. She was asked these questions on at least three separate occasions by the male personnel specialist with whom she spoke when she called the Agency to inquire about the status of her applications for this position. She had to reapply on several occasions because the vacancies for which she applied were cancelled and then readvertised later. Garvey Declaration, at ¶¶ 5–6.

13. *Priscilla McPherson.* Ms. McPherson is a class member who sought a position as a Production Specialist. Declaration of Priscilla McPherson, at ¶ 3. She was interviewed by a male USIA official who stared at her chest and stated, "Well, I'm afraid the men here would have a hard time working with you, given your attributes." *Id.*

14. *Linda Coley.* Ms. Coley is a class member who claims that she applied for three TV Broadcast Technician positions and was not hired for any of them. Declaration of Linda Coley, at ¶ 2. She then applied for the Radio Technician position, but when she checked to ensure that her application materials arrived, she was told the Agency had received them, but they had been lost and she was asked to send in another application. *Id.* at ¶ 4. Then on 6:00 p.m. of the day before the closing date for applications, she was told that the Agency had again lost her work experience form and that she should write her job experience down on a piece of paper and bring it to the Agency that evening. *Id.* at ¶ 5. Her application was ultimately rejected. *Id.* at ¶ 6. Thereafter, she applied for another Radio Technician position when it opened up. *Id.* at ¶ 7. After having been found qualified and placed on the register, she called the Agency regularly to check on her status. *Id.* at ¶ 9. During one call, an Agency official told her that the men had to be hired first and she simply would have to wait her turn. *Id.* Despite her qualifications and the underrepresentation of women in this job category, she was never offered the position. *Id.* at ¶ 10.

15. *Myrna Kluger.* Ms. Kluger contacted the Agency to apply for an Electronic

Technician position, but was told that she should not bother applying for the position and that she should stay home and take care of her baby. Declaration of Myrna Kluger, at ¶¶ 2, 3.

16. *Claire Frankel.* Ms. Frankel, a proposed intervenor and class member, sought positions both as a Radio Broadcast Technician and as an Electronic Technician. Declaration of Claire Frankel, at ¶ 2. After having been found qualified for at least one position, she was called to an interview, during which the interviewer asked her, "Why is a cute girl like you interested in a job like this?" *Id.* at ¶ 6.

17. *Carolyn Turner.* Ms. Turner is a class member and proposed intervenor who unsuccessfully sought a position as a Production Specialist and claims she was told by the Deputy Director for TV & Film that she would not be offered the position, because hiring a female would cause the Agency to incur additional costs of separate lodging for a female producer in the field. Declaration of Carolyn Turner, at ¶ 8. Furthermore, the official specifically told her that despite her qualifications for the position, he was not going to offer it to her because the substantial travel required would harm her marriage. *Id.*

18. *Michal Shekel.* Ms. Shekel is a class member and proposed intervenor who sought employment as an International Radio Broadcaster (English) and Writer. Declaration of Michal Shekel, at ¶ 3. Ms. Shekel claims that a Voice of America interviewer told her that her qualifications were great, but that having a "girl's voice" and a "guy's name" would work against her. *Id.* The interviewer also told her that she was a "very young girl" and needed more experience. *Id.* On her second attempt to apply for a broadcaster position, she was informed that the Agency was looking for "a balance" or employees. *Id.* at ¶ 8. Also, while seeking employment at the Agency, she inquired about technical positions and was told that off-air technical jobs were "mainly for men." *Id.*

19. *Jahanara Hasan.* Ms. Hasan is a class member and proposed intervenor who sought a broadcaster position in the Bangla Service. Declaration of Jahanara Hasan, at ¶ 2. After she submitted the application, the Section Chief informed her that she should not have applied because they were planning on hiring a man for the position. *Id.* at ¶ 6. Ms. Hasan was also told that women were not considered by management to be able to sustain the strenuous demands of broadcasting as were men, that not having women in full time positions was a problem, and that women needed more leaves of absence than men. *Id.* at ¶ 10. Finally, Ms. Hasan was told that women were not considered by management to be able to sustain the strenuous demands of broadcasting as men could. *Id.* Ms. Hasan was also told that a male translator and broadcaster stated that a woman should not have dared to apply for a broadcasting job and women should be involved only in jobs more suitable for females, such as teaching elementary school. *Id.*

20. *Shirley Hill Witt.* Ms. Witt is a class member and proposed intervenor who claims that she sought a position in the mid-level of the Foreign Service. Declaration of Shirley Hill Witt, at ¶ 6. After successfully completing every portion of the screening, she was rejected because, according to an Agency official, there "were enough women in the Foreign Service at mid-level." *Id.* at ¶ 8; *see also Hartman v. Wick,* 678 F.Supp. at 322.

21. *Patricia DeYoung.* Ms. DeYoung is a proposed intervenor who sought several positions in the Foreign Service/Foreign Affairs areas. Declaration of Patricia DeYoung, at ¶ 2. She claims that she personally appeared at the Personnel Office at the USIA to present applications, but a personnel officer told her that she could not be hired for such positions because only men were being sought. *Id.* at ¶ 5.

### APPENDIX B
*ANECDOTAL TESTIMONY DESCRIBING DISCRIMINATION IN THE FORM OF GENDER–BIASED EVALUATIONS AND DISCRIMINATORY APPLICATION OF SUBJECTIVE CRITERIA FROM THE RECORD IN 1978, 1979 AND ON REMAND*

1. *Donna L. Woolf.* Ms. Woolf is a proposed intervenor who applied unsuccessfully

for a lateral transfer into the Foreign Service of the USIA on two separate occasions in 1978 and in 1983. Declaration of Donna L. Woolf, at ¶ 2. Ms. Woolf contends that she had extensive training and work experience abroad in media related jobs both in and out of the USIA. *Id.* at ¶ 3. Ms. Woolf states that, upon applying for mid-level entry into the Foreign Service at USIA in 1978, she was informed that she was not qualified for the position because she lacked a sufficient amount of time at USIA. *Id.* at ¶ 4. Since her failed 1978 application, Ms. Woolf has allegedly learned of several of her colleagues whose applications were accepted despite little or no employment experience with USIA. *Id.*

Ms. Woolf states that she reapplied in 1983 "having accumulated substantially greater diplomatic and linguistic experience since [her] prior application." *Id.* at ¶ 5. Pursuant to her 1983 application, Ms. Woolf was allegedly given an oral examination and an interview in which she "perceived hostility from a male examiner" who was "generally condescending" and asked follow-up questions which were "disdainful and scornful of [her] background and experience." *Id.* at ¶ 6. Ms. Woolf's 1983 application was rejected. *Id.* at ¶ 5. She further states that when she inquired as to why her 1983 application was rejected, she was told by a male examiner that she had displayed "too much knowledge" with regard to one question. *Id.* ¶ 7. In addition, she was graded poorly for not writing complete sentences on a written portion of her exam which explicitly asked the applicant "to outline" her answer. *Id.* In sum, Ms. Woolf found her application experience "to be frustrating and highly dependant on subjective factors." *Id.* at ¶ 8.

2. *Genevieve E. Huber.* Ms. Huber is a proposed intervenor who claims that she sought a Foreign Service Position at USIA in December of 1974. Declaration of Genevieve E. Huber, at ¶ 4. Ms. Huber asserts that, after passing the written portion of the Foreign Service exam, and during the oral portion of her exam, she was given "obfuscatory instructions delivered in a tone of voice that implied that [she] was intellectually and psychologically inferior." *Id.* at ¶ 5.

3. *Lisa M. Heilbronn.* Ms. Heilbronn is a proposed intervenor who states that she applied for entry into the Foreign Service department of the USIA in 1979. Declaration of Lisa M. Heilbronn, at ¶ 2. After passing the written portion of the Foreign Service Entrance Exam, Ms. Heilbronn's application was submitted to the oral assessment process which consisted of several parts "all of which were quite subjective." *Id.* at ¶ 3. She alleges that, during her interview session, "a male interviewer challenged [her] capacity to be self-reliant in a foreign environment such as a remote post, and he expressed skepticism and refused to accept [her] positive response to his challenge." *Id.* Ms. Heilbronn was not hired by the USIA Foreign Service department.

4. *Robin Yeager.* Ms. Yeager is a proposed intervenor who states that she sat for the Foreign Service Exam several times beginning in 1979. Declaration of Robin Yeager, at ¶ 2. Ms. Yeager alleges that on one occasion when she took the examination, despite previously scoring very well on several standardized tests which tested her verbal ability, she failed the English Expression portion of the exam which resulted in a termination of her application. *Id.* at ¶ 4. Ms. Yeager asserts that when she attempted to ascertain why she did not pass the exam, "no satisfactory explanation was forthcoming." *Id.* at ¶ 5.

On another occasion, after successfully passing the written part of the Foreign Service Exam, Ms. Yeager alleges she participated in the oral portion of the exam after which she felt "particularly proud of [her] performance." *Id.* at ¶ 7. Despite her evaluation of her performance, Ms. Yeager failed her exam. *Id.* at ¶ 9. According to Ms. Yeager, her "failure at the examination cannot be explained through any objective, measurable criteria and could only be explained through the use of subjective, nonmeasurable criteria." *Id.* at ¶ 11.

On a third occasion, Ms. Yeager was again given the opportunity to take the oral exam at which she again believed she performed well. *Id.* at ¶ 12. According to Ms. Yeager,

her interview lasted until past five o'clock p.m. on a Friday. *Id.* Following her interview, she received a letter dated and postmarked on the same Friday notifying her that she had failed her oral exam which indicates that the decision to fail her was made before she had completed the examination process. *Id.*

5. *Joan S. Leopold.* Ms. Leopold is a proposed intervenor who states that she applied for a position as a Foreign Service Officer with the USIA in 1980. Declaration of Joan S. Leopold, at ¶ 2. Ms. Leopold states that at her oral exam she was asked several "'trick' questions which were not intended to test [her] knowledge." *Id.* Particularly, when she was asked what types of security measures may be necessary for an embassy, Ms. Leopold alleges that she responded that "perhaps some embassies should be equipped with metal detectors" and, according to Ms. Leopold, was "chastised by the interviewer for being overly security conscious." *Id.* ¶ 3. Ms. Leopold believed the question was a "trap" designed "to promote a confrontation." *Id.*

In another portion of the oral exam, Ms. Leopold felt she had performed "extremely well" in a group exercise but "was awarded a barely passing score" because she came across as too aggressive. *Id.* ¶ 4. Finally, Ms. Leopold states that, following the exam, she received a form from her examiners indicating that she was married although she was not asked any questions regarding her marital status during the exam. *Id.* at ¶ 5. She believes that the examiners took note of her wedding ring which she wore to the exam. *Id.* She did not obtain the position for which she had applied.

6. *Toura Kem.* Ms. Kem is a named Plaintiff who testified that she had, on numerous occasions, sought a full-time civil service position with the USIA as a broadcaster after having been employed in the Cambodian Service for a decade as a purchase order vendor. Kem Testimony, Tr. 5/30/79 at 164–70. During her ten-year relationship with the USIA as a purchase order vendor, Ms. Kem had broadcast several times on the air for the Voice of America. *Id.* According to

Ms. Kem, after she submitted herself to the USIA's written and oral testing procedures, she was informed that she had failed. *Id.* at 174.

7. *Etel Berger.* Ms. Berger is a witness who, in a deposition admitted into evidence at the liability trial, states that she sought a position as a civil servant broadcaster in the USIA's Brazilian Service. Deposition Excerpt of Etel Berger, at 41–51. Ms. Berger states that she submitted herself to written and oral testing which was ostensibly anonymous. *Id.* However, in a break in the testing, Ms. Berger states that she was confronted by two male employees who accused her of taking "a job away from a man." *Id.* at 43, 47–51. Despite the experience Ms. Berger had accumulated in the several years she had worked as a purchase order vendor, she contends that she was informed that she had failed the examination. *Id.* at 24–36, 51. After protesting the results of her test, Ms. Berger alleges that she was retested and passed a test governed by more objective procedures. *Id.* at 64–65, 67–70.

8. *Cecilia Kreutz.* Ms. Kreutz is a witness who, in her deposition admitted into evidence at the liability trial, states that she sought a civil service position as a broadcaster with the Polish Service in the USIA. Deposition Excerpt of Cecilia Kreutz, at 37–40. Pursuant to her interest in the broadcasting position, Ms. Kreutz states that she was given written and oral examinations which she failed. *Id.* Because of her extensive experience in broadcasting and her native fluency in Polish, Ms. Kreutz states that she challenged her test results. *Id.* at 45–47. Following her challenge, Ms. Kreutz alleges that she was retested and found to be eligible for employment as a broadcaster. See Attachment 22 to Plaintiff's Memorandum of Points and Authorities in Support of Class Certification, U.S. Civil Service Commission Certificate of Eligibility.

9. *Marianna Serbu.* Ms. Serbu is a proposed class member who states that she sought a civil service position as a Romanian broadcaster with the USIA in 1979. Declaration of Marianna R. Serbu, at ¶ 6. According to Ms. Serbu, she was given written and oral examinations after which she was noti-

fied that she had failed. *Id.* Ms. Serbu states that she had received the equivalent of a B.A. and a M.A. from a Romanian university and had taught French to Romanian university students and Romanian at the Berlitz language school. *Id.* at ¶¶ 2, 3, 7.

Unable to accept her test results, Ms. Serbu contends that she asked to see her exam and how it was graded. *Id.* at ¶ 6. Upon analyzing her exam, she allegedly found that the grader had graded her answers based on a form of Romanian dialect which had been out of use since the 1940's. *Id.* After she pointed this out, Ms. Serbu alleges that the graders agreed to regrade the test and found that she had actually passed, after which she was placed on a waiting list for a foreign language broadcaster position. *Id.*

In 1980, Ms. Serbu contends that she was asked to take another exam to keep her eligibility for a broadcaster's job current. *Id.* at ¶ 7. After her second test, Ms. Serbu states that she was informed that she had failed. *Id.* Ms. Serbu states that she again sought to review the grading procedures used on her exam, however, she was not allowed to review the second exam. *Id.*

10. *Jahanara Hasan.* Ms. Hasan is a proposed intervenor who states that she sought several civil service positions as a Foreign Language Broadcaster in the Bangla Service of the USIA. Declaration of Jahanara Hasan, at ¶ 2. Ms. Hasan contends that she had strong qualifications for applying for the jobs which she sought. *Id.* at ¶ 3. According to Ms. Hasan, at her oral examination, she was tested by three male evaluators, one of whom was the Chief of the Bangla Service and had expressed hostility specifically towards her and the employment of women in the Bangla Service in general. *Id.* Despite her extensive experience as a professor, writer, and broadcaster for All Pakistan Radio, following her exam, Ms. Hasan states that she was informed that she had failed. *Id.* at ¶ 9. According to Ms. Hasan, the evaluator of program content for the Bangla Service, an official outside of USIA, "expressed great surprise, as did others in the fields of broadcasting and film-making" when they learned that Ms. Hasan

failed her language exam. *Id.* at ¶ 10. In addition, when Ms. Hasan protested the results of her exam and asked that it be graded by an outside grader, she alleges the Bangla Service refused to have the test reviewed by an outside grader. *Id.* at ¶ 11.

11. *Rita Brown.* Ms. Brown is a witness who, in a deposition submitted into evidence during the liability trial, testified that the testing procedures employed at USIA were not anonymous. Deposition Excerpt of Rita M. Brown, at 74–77. She also testified that the graders of the exams, as well as those who made the selections of hires, were predominantly male. *Id.* at 71–74.

12. *Jeanne Jackson.* Ms. Jackson, who was head of personnel at Voice of America, is a witness who testified that the foreign language broadcasting tests and evaluation procedures were subjective. Jackson Testimony, Tr. 6/4/79, at 39. Ms. Jackson also testified that the process of evaluating tests was run by a group the majority of which were males who were selected by male service chiefs. *Id.*

13. *Ellen Shapiro.* Ms. Shapiro is a class member who states that she applied for entry into the Foreign Service department of the USIA in 1979. Declaration of Ellen C. Shapiro, at ¶ 2. After passing the written portion of the Foreign Service exam, Ms. Shapiro states that she took the oral portion of the exam. *Id.* Ms. Shapiro states that "the interview portion of the assessment was performed in a perfunctory manner." *Id.* at ¶ 4. She relates that she was interviewed by one male and one female who asked her questions "in a curt, almost hostile manner and seemed quite uninterested in [her] responses. Their demeanor and reactions suggested that they had already rejected [her] as a candidate even before the interview really got started." *Id.* She was not selected for the position.

14. *Lorraine Davis–Quick.* Ms. Davis–Quick is a class member who has submitted a signed affidavit in which she states that she sought a position as a Radio Broadcast Technician ("RBT") with USIA in June of 1980. Declaration of Lorraine Davis–Quick, at ¶ 8. Ms. Davis–Quick asserts that she and a male colleague together applied for a position as

an RBT with the Voice of America at that time. *Id.* According to Ms. Davis–Quick, each completed the requisite forms and submitted their applications within one week of each other. *Id.* At the time, Ms. Davis–Quick believed her qualifications earned in several markets in a wide range of broadcasting capacities were "equal to or better than those" of her male colleague. *Id.* at ¶ 9. According to Ms. Davis–Quick, her male colleague was hired within several weeks after his application. *Id.* at ¶ 10.

Ms. Davis–Quick claims, on the other hand, that she did not receive any notification on her score on Self Appraisal forms for several weeks. *Id.* at ¶ 11. She further asserts that, when she finally did receive notification, Ms. Davis–Quick learned that she had scored in the mid–70's and was informed that this "was 'very good' for a female without military service." *Id.* at ¶ 12. Ms. Davis–Quick states that she continued to make status checks every few months on her application with an administrative officer in the VOA who at one instance was surprised at Ms. Davis–Quick's continued interest given that she had allegedly been told that Ms. Davis–Quick was no longer interested in the position. *Id.* at ¶ 13. Ms. Davis–Quick states that when asked who had said this, the administrative officer could not give the name of the person who had given this information. *Id.*

According to Ms. Davis–Quick, a year after she had filed her original application, her file was lost and she was asked to complete another set of required forms. *Id.* at ¶ 14. In 1980 and 1981, the Agency posted openings for the Radio Broadcast Technician position for which Ms. Davis–Quick had applied, and she was interviewed and offered a position. *Id.* at ¶ 15. However, according to Ms. Davis–Quick her name did not appear on the December 15, 1981, or January 6, 1982 priority lists for RBTs. *Id.* at ¶ 16.

15. *Lynn Goldman.* Ms. Goldman is a claimant who states that she had applied to the Voice of America ("VOA") in April of 1980 for the position of Radio Broadcast Technician ("RBT"). Declaration of Lynn Goldman, at ¶ 3. Ms. Goldman states that her husband also applied to the VOA on the same date. *Id.* At the time of their applications, the work experience and job-related background of Ms. Goldman and her husband were very similar. *Id.* In August of 1980, Ms. Goldman alleges that Mr. Goldman received notification that he was eligible for hire and was then hired by the VOA as an RBT. *Id.* at ¶ 4. Ms. Goldman further alleges that, while an administrative officer in the VOA "discouraged [her] from further pursuing my application because she told [her] that [she] was not eligible for hire as a Radio Broadcast Technician without on-air experience," Ms. Goldman's husband was hired without any on-air experience. *Id.* at ¶ 5.

Ms. Goldman alleges that she reapplied to the VOA in February of 1982 and received a notice in April of that year which said that she did not receive an acceptable score on her test. *Id.* at ¶ 6. Ms. Goldman compared her score with that of Mr. Goldman who received an acceptable score. *Id.* at ¶¶ 7–9. According to Ms. Goldman, there were several differences in the scoring of similar answers that she and her husband gave on the written portion of the exam. *Id.* at ¶ 9. In addition, Ms. Goldman claims that her husband's rating sheet contained the names of the three individuals who scored his qualifications while her sheet contained no names. *Id.* at ¶ 10. Ms. Goldman contends that, when she checked on her second application, she was informed that she needed to attach an addendum updating her work experience. *Id.* at ¶ 12. When an administrator told her that the addendum would not be read because it was submitted on the wrong form, Ms. Goldman allegedly learned that no such form existed. *Id.*

According to Ms. Goldman, she received a rating in February of 1983 stating that she was eligible for hiring. *Id.* at ¶ 13. However, despite her new rating she was not offered employment by the VOA. *Id.* at ¶ 15.